**Daniel Lee CORWIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71072.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 15, 1993.

Jerald D. Crow, Conroe, for appellant.

Peter C. Speers, III, Former Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

CLINTON, Judge.

Appellant was convicted of murdering more than one person pursuant to the same scheme or course of conduct, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(6)(B).[1] The jury returned "yes" answers to the special issues under former Article 37.071, § (b),

V.A.C.C.P., and punishment was assessed accordingly at death. *Id.*, § (e). The appeal is automatic to this Court. *Id.*, § (h). Appellant does not challenge the sufficiency of the evidence either to support appellant's guilt or the jury's affirmative answers to the special issues.

## I. CRIME

In his fourteenth point of error appellant contends the trial court erred to deny his pretrial motion to dismiss the indictment as based upon a statute that is unconstitutionally vague. In his fifteenth point of error he contends that his conviction should be reversed for the same reason. Appellant consolidates his argument on these points of error on appeal, and we will treat them together.

Appellant argues that § 19.03(a)(6)(B) is defective in that, as he articulated it in his pretrial motion, and reiterates now on appeal, it "does not define scheme or course of conduct and arbitrarily allows any two murders regardless of time frame or location to constitute the same scheme or course of conduct." He contends this indefiniteness renders the statute violative of the Due Process

---

1. The indictment alleged that appellant:
 "... on or about the 10th day of July, 1987, ... did then and there, while in the course of committing and attempting to commit kidnapping and aggravated sexual assault of Debra Ewing, intentionally cause the death of Debra Ewing by stabbing her with a knife and strangling her with a ligature, the exact description of which is unknown to the Grand Jury ...
 "... and ... that [he], during different criminal transactions and pursuant to the same scheme and course of conduct, murdered more than one person, to wit:
 "On or about July 10th, 1987, in Montgomery County, Texas, he did then and there, while in the course of committing and attempting to commit kidnapping and aggravated sexual assault of Debra Ewing, intentionally cause the death of Debra Ewing by stabbing her with a knife and strangling her with a ligature, the exact description of which is unknown to the Grand Jury;
 "On or about February 13, 1987 in Robertson County, Texas, he did then and there, while in the course of committing and attempting to commit kidnapping and aggravated sexual assault of Alice Martin, intentionally cause the death of Alice Martin by stabbing her with a knife and strangling her with a ligature, the

exact description of which is unknown to the Grand Jury;
 "And, on or about October 31, 1987 in Walker County, Texas, he did then and there, while in the course of attempting to commit kidnapping and aggravated sexual assault of Mary Risinger, intentionally cause the death of Mary Risinger by stabbing her with a knife[.]"
The jury instruction at the close of the guilt phase of trial required the jury to find appellant thus murdered Debra Ewing, and that he also thus murdered either Alice Walker, or thus murdered Mary Risinger, during the same scheme or course of conduct. Oddly, the indictment effectively charges three capital murders under V.T.C.A. Penal Code, § 19.03(a)(2). Each of the three victims was allegedly murdered intentionally, and in the course of commission or attempted commission of at least one of the enumerated felonies therein. Nevertheless, the State's avowed theory of prosecution was at all times § 19.03(a)(6)(B), supra, and both the indictment and the jury charge require a finding that appellant killed at least two of the victims, and that those two murders were committed pursuant to the same scheme or course of conduct, in order to convict him of capital murder.

Clause of the United States Constitution.[2] He acknowledges that in order to prevail he must persuade the Court that the statute is vague as it applies to his own specific conduct—that the statutory language gave no indication that he could be susceptible to prosecution for capital murder. See, e.g., *Vuong v. State*, 830 S.W.2d 929, at 941 (Tex. Cr.App.1992); *Johnson v. State*, 853 S.W.2d 527, at 534 (Tex.Cr.App.1992).

Over the course of nine months in 1987 appellant abducted, sexually assaulted, and killed two women, and then attempted to abduct, and when he could not, killed, a third. In July of 1987 he abducted twenty-six year old Debra Ewing from the Huntsville Vision Center, where she worked. He apparently drove her to a remote area of Montgomery County, raped her in the front seat of his truck, and then strangled her with a ligature of some sort and stabbed her twice in the chest. In February of the same year appellant had abducted a seventy-two year old Alice Martin, who was taking her daily walk along a farm to market road in Madison County. He apparently drove her to a more remote area in Robertson County, raped her in the front seat of his truck, and then strangled her with a ligature and stabbed her four times in the back. On Halloween evening of 1987 appellant tried to force thirty-six year old Mary Risinger into his truck at a car wash in Huntsville. When she put up a struggle, he stabbed her in the throat, severing every major blood vessel in her neck.

At the punishment phase it was shown appellant had committed similar offenses both before and after the three offenses in 1987. In 1975 appellant abducted a high school classmate and drove her in her own car to a gravel pit, where he raped her. He then forced her out of the car, slashed her throat, stabbed her in the heart, and left her for dead. Miraculously, she lived. Appellant was assessed a forty year prison sentence for this offense. In October of 1988 appellant abducted a Texas A & M co-ed in her own vehicle and drove her to a park. There he sexually assaulted her, then tied her arms around a tree and slashed and stabbed her throat. She also survived. Appellant was serving time for this last offense during the instant prosecution.

Appellant argues that lack of definition of the phrase "same scheme or course of conduct" renders the statute so indefinite he cannot tell whether his conduct in killing more than one person during different transactions was a capital offense. Moreover, he contends, law enforcement authorities cannot tell any more readily than he can, and that leaves him open to arbitrary prosecution. See *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Appellant complains that, without further definition, it is unclear whether "same scheme or course of conduct" reaches over a span of nine months and four counties, as the conduct alleged in the indictment and proven at trial does.

█ Appellant is mistaken in thinking that § 19.03(a)(6)(B) is indefinite simply because it fails to specify that the different transactions during which more than one person are killed must occur over a definite period of time or in a definite location.[3] Undoubtedly the Legislature intended a limiting principle in the phrase "same scheme or course of conduct." There is no inherent constitutional requirement that there be such a limiting principle, however, much less that

---

2. Appellant also contends the statute violates the Texas Constitution, but makes no separate argument to that effect. It has been the Court's practice to "decline to pursue appellant's Texas Constitutional arguments for him." *Johnson v. State*, 853 S.W.2d 527, at 533 (Tex.Cr.App.1992).

3. Appellant cites *Grayned v. City of Rockford*, supra, for this proposition. In *Grayned* a city ordinance proscribing such noise or diversion as "disturbs or tends to disturb the peace or good order of" school activities was assailed on vagueness grounds. The ordinance was limited, however, to noises made adjacent to school premises and during school hours. In upholding the constitutionality of the ordinance, the United States Supreme Court noted, *inter alia*, that the conduct proscribed was limited in time and place. That such factors may contribute to render an ordinance sufficiently definite to pass constitutional muster, however, does not mean they are indispensable to the constitutionality of any and every statute.

it be expressed in temporal or spatial terms.[4] Nevertheless, it is clear that the Legislature did not intend that every different-transaction multiple killing comprise a capital murder. And while the Legislature need impose no limiting principle, and while any limiting principle it does impose need not be articulated in terms of time or place, if the Legislature does impose a limiting principle, that principle must be sufficiently definite that the putative defendant, and the prosecuting officials, can ascertain which different-transaction multiple murders are capital, and which are not.

■ At the public hearing of the House Committee on Criminal Jurisprudence, conducted on February 11, 1985, the sponsors of House Bill 8, which was later promulgated as § 19.03(a)(6), supra, made it clear that subsection (B) was meant to embrace "serial" murders.[5] The Revised Bill Analysis for House Bill 8 gives as an example of same scheme or course of conduct one who, "e.g. kills all Senators over the course of a year for snubbing his legislation." It is true that appellant's conduct does not indicate this kind of over-arching objective or motive. But the example was not meant to be exhaustive. In our view, appellant had sufficient notice that his conduct was proscribed as a capital offense because committed "pursuant to the same ... course of conduct."

In his brief appellant sets out the following definitions of "same," "course," and "conduct" taken from Webster's New Universal Unabridged Dictionary:

"**SAME**, adjective: 1. Identical; alike in every respect. 2. Alike in degree, kind, character, or quality ...

**COURSE**, noun: ... 7. A regular mode or pattern of action or behavior; customary or established sequence of events; recurrence of events according to certain laws. 8. A way, path, or channel of movement ...

**CONDUCT**, noun: ... 4. Personal behavior; deportment; way that one acts ..."

Given these definitions, however, we do not believe § 19.03(a)(6)(B) is unconstitutionally vague as applied to appellant's conduct.

■ In abducting, raping, and killing or attempting to kill five women in more or less the same way over the course of some thirteen years, interrupted only by a lengthy sojourn in the penitentiary, appellant can reasonably be said to have engaged in "a regular mode or pattern of ... behavior."[6] The evidence shows that Ewing, Martin, and Risinger were each murdered pursuant to this same "regular mode or pattern of behavior." Perhaps in hypothetical cases, as the time and distance between murders committed during different transactions increases, and as the actor's motive or *modus operandi* vary, it will become more difficult for putative defendants and law enforcement agencies to say with certainty that the murders occurred "pursuant to the same ... course of conduct." But appellant demonstrates no such uncertainty on the present facts, and the evidence was sufficient for a rational jury to find it was in fact "pursuant to the same

---

4. Indeed, as originally drafted, as of November 12, 1984, House Bill 8, which eventually became § 19.03(a)(6), supra, simply made it a capital offense to murder more than one person "whether or not the murders occur during the same criminal episode." Thus, in its pristine incarnation, the legislation contained no limiting principle whatsoever. Whatever else might be said for such a provision, it would not seem to suffer from vagueness.

6. We think it permissible to consider in this context the evidence presented at the punishment phase relevant to the pattern of appellant's behavior over the years. After all, the question is not whether the evidence is sufficient to establish the offense of capital murder under § 19.-03(a)(6)(B), supra, but whether appellant had notice, prior to the indictment, that his ongoing conduct could make him liable to prosecution under that provision.

... course of conduct" that appellant committed these murders. "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo,* 332 U.S. 1, at 7, 67 S.Ct. 1538, at 1542, 91 L.Ed. 1877, at 1883 (1947). See also *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Goocher v. State,* 633 S.W.2d 860 (Tex.Cr.App.1982). This is true even for statutes defining capital offenses. *Robinson v. United States,* 324 U.S. 282, at 285–86, 65 S.Ct. 666, at 668–69, 89 L.Ed. 944, at 947 (1945).[7] Whatever doubt may exist at the periphery, we think that the "core" conduct proscribed by § 19.-03(a)(6)(B) is clear enough, and that appellant's conduct fell within it. *Smith v. Goguen,* 415 U.S. 566, at 577–78, 94 S.Ct. 1242, at 1249–50, 39 L.Ed.2d 605, at 614–15 (1974). Accordingly, we overrule appellant's fourteenth and fifteenth points of error.

## II. CONFESSION

Appellant's first, third, fourth, sixth and thirteenth points of error all pertain one way or another to the admissibility of a number of statements he gave, both in writing and on videotape, pertaining to the various offenses outlined above. He argues, respectively, that the statements were given after his right to counsel was invoked but no counsel provided, and after a defective magistrate's warning; that the videotaped confessions do not comply with Article 38.22, V.A.C.C.P.; that the trial court erred in not submitting the issue of the voluntariness of the confessions to the jury at the conclusion of the guilt phase of trial; and lastly, that all of the statements were given involuntarily under the totality of the circumstances. To the extent appellant's involuntariness claim incorporates several of the others, *viz:* that he was denied his right to counsel, and that the magistrate's warning was defective, we will consolidate them, and consider them first.

### A. The Statements

Evidence presented at the hearing on appellant's motion to suppress showed that on March 15, 1989, appellant began serving a 99 year sentence for the attempted capital murder of the Texas A & M co-ed he had abducted the previous October. On the afternoon of Thursday, March 23, 1989, Lou Davis, a sociologist at the Texas Department of Criminal Justice, Institutional Division, interviewed appellant at the Goree Unit in an effort to classify him for purposes of assigning him to a particular unit. At the conclusion of the normal interview, because he was "curious," Davis began to question appellant about the three offenses involved in this cause, for which he knew appellant had once been a suspect from newspaper clippings in his file. At first appellant denied any involvement, but with further questioning he readily talked to Davis about the killings of Risinger and Ewing. Davis testified he made no promises to appellant to obtain these admissions. These oral confessions were not admitted into evidence at trial.

After this interview, Davis telephoned, A.P. Merillat, a detective with the Huntsville Police Department, and informed him of appellant's admissions. Merillat asked Davis whether appellant would be willing to talk to him. Davis recalled appellant to his office and told him Merillat wanted to talk. Appel-

---

7. Appellant cites both the Eighth and the Fourteenth Amendments in his statements of points of error fourteen and fifteen. *In the body of his* argument, however, he predicates his claim solely on a due process notice analysis, and, as noted *ante,* concedes that under the Due Process Clause he must show the statutory provision is vague as applied to his conduct. But see *Maynard v. Cartwright,* 486 U.S. 356, at 361–62, 108 S.Ct. 1853, at 1858, 100 L.Ed.2d 372, at 380 (1988) ("Claims of vagueness directed at aggravating circumstances defined in capital punish-ment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)." Appellant develops neither this nor any other specific Eighth Amendment vagueness claim, and we shall not construct his arguments for him.

lant "ultimately" agreed,[8] and Davis summoned Merillat. When Merillat arrived, he Mirandized appellant,[9] and appellant acknowledged he understood. Merillat asked appellant whether he would make a formal statement, but appellant declined to do so "without first talking to an attorney."[10] Nevertheless, he indicated that he "wanted to get something off his chest," and began to talk about the murders of Ewing and Risinger. Because Merillat had not participated in the initial investigation of either of those cases, appellant "more or less led the discussion, and [Merillat] would ask questions to clarify for [himself] if [he] didn't understand something...." This conversation lasted two to three hours, and was not recorded in any fashion.

Sometime after lunch on Monday, March 27, 1989, after the Easter weekend, Merillat returned to the Goree Unit and spoke with appellant in the visiting room. He informed appellant that an inter-agency law enforcement task force was meeting at the Criminal Justice Center in Huntsville as they spoke, and that he had been sent to tell appellant that the task force was considering seeking an evidentiary search warrant for appellant's truck and his parent's home.[11] At this point, according to Merillat, appellant "interjected":

"'I've been thinking about it over the weekend. I'm ready to talk to you.' And I said, 'You remember the other night you said you didn't want to say anything formally without a lawyer's advice.' He said, 'I know, but I've decided I want to go ahead and give you a statement.'"

Merillat returned to the task force meeting to convey this new development.

Members of the task force decided that before a statement was taken, appellant should be warned by a magistrate. This was done in Davis' office at the Goree Unit shortly before 3:30 o'clock in the afternoon. Appellant indicated that he understood the warning. He signed the warning form, and did not request a lawyer. He then began to narrate while Merillat wrote out the narration by hand. Appellant read over and approved separate handwritten statements as to the murders of Ewing and Risinger. These statements were reduced to typewritten form, and appellant read over them again. He then signed both the handwritten and typewritten versions of each statement in Davis' presence.[12] Both Davis and Merillat testified that no threats or promises were made to obtain these statements; both opined that they were given voluntarily.

Appellant agreed to accompany Merillat to the sites of the offenses. Accordingly, the next morning, March 28, 1989, appellant was bench-warranted to Walker County, and he, Merillat, Davis, and another law officer visited the Huntsville Vision Center, where Ew-

---

8. Davis testified on cross-examination that it was "possible" that at first appellant had told him he "didn't know" whether he wanted to talk to the police, and that "he wanted to think about it." He testified it was also "possible" appellant had told him he wanted to speak to an attorney first, but if so, Davis did not remember it. In any event, appellant was "hesitant ... initially." Davis encouraged appellant to "talk to the police and make it right," assuring him that "it would do him good to talk about it, to get it out," or words to that effect.

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. This was Merillat's testimony. Davis, who was also present, testified, however, that he was "sure" appellant said nothing about wanting to speak to an attorney. For his part, appellant testified he had told Davis he did not want to make "any kind of statement at all" before consulting an attorney. He admitted telling Merillat he wanted to speak to an attorney before making

"any kind of formal statement," but did agree to talk to Davis "informally," and later, to Merillat "just kind of basically off the record."

11. Merillat did not know why the task group wanted him to convey this information to appellant. Appellant testified that Merillat threatened to "storm troop" his family unless appellant cooperated by making a formal statement. Merillat admitted he told appellant that execution of a warrant "would be a hassle for [his parents] because there would be a lot of police officers roming [sic] around his house." He denied threatening appellant, however, that "there was going to be a lot of trouble for his parents" unless he gave a statement. In any event, the task force clearly hoped Merillat might be able to obtain a written statement from appellant.

12. These written statements contain all warnings required by Article 38.22, § 2, V.A.C.C.P. Appellant does not challenge admissibility of any statements on the basis of failure to give Miranda or Article 38.22 warnings.

ing was abducted, and the car wash where Risinger was killed. His memory apparently stimulated, upon return to the jail appellant gave new statements. These were taken in the same manner as before, and were also reduced to typewritten form, and signed in Davis' presence. Appellant was not coerced, and in the opinions of Merillat and Davis, gave these statements voluntarily.

On April 4, 1989, appellant agreed to accompany Merillat and Davis to the area where Martin's body was found. Afterward, after another magistrate's warning, appellant gave Merillat a written statement, as before, regarding his involvement in this killing as well. He was neither threatened nor promised anything. On April 27, 1989, appellant assented to a videotape recording of an interview with Texas Ranger Stan Oldham. Appellant participated "freely," and no threats or promises were made. Although we do not have the videotape in the record before us, it appears appellant discussed all of the cases outlined *ante*, including the 1975 offense.

## B. Voluntariness

■ All of the written statements from March 27, March 28, and April 4, 1989, were admitted into evidence at the guilt phase of trial. An edited version of the videotape of April 27, 1989, was admitted at the punishment phase. The trial court filed findings of fact and conclusions of law as required by Article 38.22, § 6, V.A.C.C.P., albeit somewhat belatedly.[13] Appellant argues that under the totality of the circumstances, each of his statements was made involuntarily. It is not entirely clear whether appellant is claiming that his right to due process was thus violated, or that waiver of his Fifth Amendment privilege against self incrimination was involuntary, or both.[14] See *Griffin v. State*, 765 S.W.2d 422, at 428–29 & n. 11 (Tex.Cr. App.1989). Because "[t]he analyses are substantially the same[,]" *id.*, at 430, we will address both.

Appellant lists the following circumstances he claims combine to render his statements involuntary: first, Davis failed to Mirandize appellant prior to questioning him about the instant offenses during the intake interview of March 23; second, appellant invoked his Fifth Amendment right to counsel before both Davis and Merillat on March 23, but that right was never honored; third, appellant agreed to give statements on March 27 only after Merillat threatened to "storm troop" appellant's family unless appellant cooperated; and finally, that the magistrate's warning on March 27 failed to specify the accusation against appellant, as required by Article 15.17(a), V.A.C.C.P. We will take these up *seriatim*.

### i. Miranda

■ Appellant contends that when Davis questioned him on March 23 at the conclusion of his intake interview, this amounted to custodial interrogation, thus requiring Miranda warnings. The State concedes, at least, that appellant was in custody. The trial court concluded that Davis was not acting at the instigation of police, and his questioning of appellant therefore did not amount to "custodial interrogation." Even assuming that it was, however, failure to give Miranda warnings before an oral confession does not automatically render involuntary a subsequent, warned written confession, either for Fifth Amendment purposes, see *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), or for purposes of due process analysis, *Griffin v. State*, supra. Appellant recognizes this, but invites us to "reconsider" our holding in *Griffin*. We decline.

### ii. Right to Counsel

■ From the testimony of Merillat and Davis, and, for that matter, of appellant himself, the trial court reasonably concluded that appellant's invocation of the right to counsel was expressly limited to "formal" statements. As long as that particular wish

---

13. The hearing on the motion to suppress extended over a period of five weeks and concluded on December 13, 1989. However, the trial court's findings of fact and conclusions of law were not filed until May 16, 1991.

14. Again appellant makes parallel claims under analogous provisions of the Texas Constitution, but fails to make independent argument. As before, we will limit our consideration accordingly.

was respected, there was no Fifth Amendment barrier to further, otherwise voluntary, informal conversation between police and appellant. *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). By all accounts appellant was willing to speak to Merillat "off the record," as it were, without the presence of an attorney. Given the holding in *Barrett*, the trial court's conclusion that the categorical prohibition against police initiation of further communication without an attorney, announced in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), did not apply was proper. Furthermore, the trial court was entitled to credit Merillat's testimony that during just such an informal conversation appellant "interjected," without prompting, an apparent willingness to make a "formal" statement *sans* benefit of counsel after all. Under the circumstances the trial court reasonably concluded that the State met its burden to prove that during a constitutionally permissible conversation with police appellant validly waived his right to counsel to the limited extent he had earlier invoked it. See *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). There is thus ample support in the record for the trial court's conclusion that appellant suffered no deprivation of his Fifth Amendment right to counsel. We therefore reject the argument that deprivation of that right was a circumstance that rendered either waiver of his Fifth Amendment right to silence involuntary, or the statements themselves involuntary under the Due Process Clause.

### iii. Threats

■ Merillat denied that on March 27 he threatened to "storm troop" appellant's parents unless appellant agreed to give written statements. The trial court is the institutional arbiter of fact in matters of admissibility of evidence. See Tex.R.Cr.Evid., Rule 104(a). Although the trial court made no express finding on this particular factual dispute, the trial court did "find" that none of appellant's statements was "the product of coercion or improper inducement of any kind." The record supports the trial court's implicit acceptance of Merillat's denial that he threatened appellant or promised him anything in order to obtain his cooperation.

### iv. Magistrate's Warning

■ On the magistrate's form contained in the record, signed by appellant and the magistrate and witnessed by Merillat, in the space provided to show the offense for which the arrested person is charged simply appears the handwritten notation, "No Charge." Appellant acknowledges that a causal connection must be established between the failure to properly admonish under Article 15.17(a), supra, and the making of a confession. E.g., *Black v. State*, 432 S.W.2d 951 (Tex.Cr.App.1968). He argues that the failure of the magistrate, or anybody else, to inform him he was susceptible to prosecution for capital murder is another circumstance showing the involuntariness of his statements.

■ Strictly speaking, failure to inform an accused of the subject of the interrogation following Miranda warnings goes to the knowing and intelligent nature of the waiver, not to its voluntariness. *Colorado v. Spring*, 479 U.S. 564, at 573, 107 S.Ct. 851, at 857, 93 L.Ed.2d 954, at 965 (1987). The same is true, we think, of failure to inform an accused of the full extent of his possible exposure under the law. Because voluntariness *per se* is thus not implicated, appellant suffered no due process deprivation. Moreover, informing the accused of the full subject matter of the interrogation is not essential to a finding that he validly waived his Fifth Amendment rights. *Id.*, 479 U.S. at 573–75, 107 S.Ct. at 857–58, 93 L.Ed.2d at 965–66. Here appellant was informed of the subject matter of every statement he was asked to give. We hold that, as in *Spring*, the fact that he was not also informed of the extent of the charges to which he was susceptible "could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." *Id.*, 479 U.S. at 577, 107 S.Ct. at 859, 93 L.Ed.2d at 967.

The record bears out the conclusion that appellant's statements were all made voluntarily under the Due Process Clause. It

likewise supports the conclusion that waiver of his Fifth Amendment rights was voluntary as well. We therefore overrule appellant's first, third, and thirteenth points of error.

### C. Other Confession Points

#### i. Voices

In point of error four appellant contends that the videotape recording made on April 27, 1989, should not have been admitted at the punishment stage because not every speaker on the videotape is identified. Oldham testified at the punishment phase that only he and appellant were involved in the conversation, and that any other voices "would be coming from outside the door ... unrelated to what we were doing. It would be ... other officers working in the normal course of their duties...." It is apparently these other voices that are not identified.

■ Article 38.22, § 3(a)(4), V.A.C.C.P., prohibits admission of an oral recorded statement "unless ... all voices on the recording are identified." In 1989 the Legislature added a subsection (e) to § 3, to elaborate that, *inter alia*, "only voices that are material [need be] identified[.]" See Acts 1989, 71st Leg., ch. 777, p. 3406, § 2, eff. Sept. 1, 1989. This elaboration was made expressly applicable only to oral recorded statements made after its effective date. *Id.*, § 3. Thus, appellant's April 27 videotaped statement is controlled by the statute as it read prior to the 1989 amendment. Appellant contends, therefore, that even immaterial voices must be identified as a prerequisite to admission of his videotaped statement. We disagree.

Construing the unamended statute, this Court held in *Lucas v. State*, 791 S.W.2d 35, at 57–58 (Tex.Cr.App.1989), that incidental voices need not be identified to satisfy Article 38.22, § 3(a)(4). There we distinguished:

> "between one who actively contributes to the videotaped recording from one whose voice is in the background and whose comments have no material relevance to the taped interview. Where all the actors who are speaking are visible to the viewer, at one time or another, as here, and where there is no instance of an off-camera actor interjecting or attempting to interject com-

ments directly pertaining to the statement or discussion in question, we cannot say any individual's voice remains 'unidentified' for purposes of Article 38.22...."

Our opinion in *Lucas* was handed down in March of 1989.

Senate Bill 55, which later became the amendment that added subsection (e) to Article 38.22, § 3, went to conference committee in May of 1989. One matter in dispute was whether to keep a provision of the Senate version calling for strict construction of the requirements of Article 38.22, § 3(a), including the requirement at issue here that all voices be identified. The full House had rejected this provision altogether. The conference committee compromised by reinstating the provision, but with certain provisos, one of which was that "only voices that are material" need be identified. The compromise was adopted and promulgated in Article 38.22, § 3(e)(1), supra.

In view of this legislative history, we reject appellant's argument that the addition of subsection (e)(1) serves as evidence that the Legislature meant for subsection (a)(4) to be strictly construed prior to the 1989 amendment. On the contrary, we consider the addition of subsection (e)(1) as evidence the Legislature did not want to abrogate the liberal construction we had given to subsection (a)(4) two months earlier in *Lucas* by imposing on it a strict construction requirement. *Lucas* is still authoritative law, and it controls appellant's contention. Accordingly, we overrule his fourth point of error.

#### ii. Voluntariness Revisited

■ Appellant complains in his sixth point of error that the trial court failed to submit to the jury his requested instruction on the voluntariness of his statements pursuant to Article 38.22, §§ 6 & 7, supra. The issue boils down to whether "evidence pertaining to such matter" was "submitted to the jury" during the guilt phase of trial. *Id.* The instruction appellant requested would have authorized the jury to disregard all of his statements if it determined that he "was persuaded to abandon his request for an attorney before making a formal statement

when advised by A.P. Merillat on March 27, 1987 [sic] that a joint law enforcement group had been formed and that warrants would be obtained to search the residence of [his] parents[.]" Given his requested instruction, we take appellant to mean that the trial court erred in failing to submit to the jury the factual issue of whether the waiver of his Fifth Amendment right to counsel was voluntary—not whether the statements themselves were voluntary under the Due Process Clause. See *Griffin v. State*, supra.[15]

As the State points out, however, there was no evidence before the jury that appellant's waiver of his right to counsel on March 27, 1989, was anything but voluntary.

Merillat testified at trial that during his meeting with appellant on March 27, appellant had broached the subject of giving a formal statement in spite of his earlier invocation of the right to counsel, and that he had not threatened appellant or promised him anything. There was no contrary evidence admitted before the jury. Evidence from the State admitted in anticipation of a claim of involuntariness does not by itself raise the issue. *Brooks v. State*, 567 S.W.2d 2, at 3 (Tex.Cr.App.1978). Appellant alleges certain inconsistencies between Merillat's testimony at trial and that which he gave earlier at the pre-trial motion to suppress hearing,[16] but the jury was not privy to the latter. Without

---

**15.** Appellant cites *Anderson v. State*, 635 S.W.2d 943 (Tex.App.—El Paso 1982, pet. ref'd), for the proposition that a factual dispute whether waiver of the Fifth Amendment right to counsel was voluntary will support a jury instruction under Article 38.22, §§ 6 & 7, supra. It is arguable, however, that at the time these provisions were originally drafted, the only issue the Legislature contemplated placing before the jury was the due process question whether the confession itself was voluntary—not whether other rights protective of the accused's Fifth Amendment privilege against compulsory self-incrimination were voluntarily waived. Indeed, when what were at the time subsections (b) and (c) of Article 38.22 were promulgated in 1965, it was essentially in response to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)—an opinion bearing solely on the voluntariness of confessions under the Due Process Clause. *Miranda v. Arizona* itself was not decided until 1966. Therefore, *Anderson v. State*, supra, and *Moon v. State*, 607 S.W.2d 569, at 571 & 572 (Tex.Cr.App.1980), notwithstanding, it may be argued that current Article 38.22, §§ 6 & 7, supra, should not be read to authorize jury instruction to resolve the issue of whether the Fifth Amendment right to counsel was voluntarily waived.

On the other hand a plausible argument can be made that matters beyond due process voluntariness were also within the contemplation of the Legislature when it promulgated subsections (b) and (c) of Article 38.22 in 1965. These provisions were obviously meant to codify this Court's own judicial response to *Jackson v. Denno* in *Lopez v. State*, 384 S.W.2d 345 (Tex.Cr.App. 1964). And in *Lopez* we opined that "[t]he same procedure may be followed in cases involving questions raised about the failure to comply with the [*Miranda*-like, albeit pre-*Miranda*] terms of Article 727 Vernon's Ann.C.C.P. [1925], relating to when a confession though voluntarily made shall not be used." Prior caselaw held that where evidence raised an issue such as whether officers had warned the accused as mandated by former Article 727, the predecessor to Article

38.22, that issue should be submitted to the jury in the charge. E.g., *Bandy v. State*, 143 Tex. Cr.R. 457, 159 S.W.2d 507 (1942). If the Legislature meant to adopt *Lopez* in toto, notwithstanding its use of the language of due process voluntariness in what is now § 6 of Article 38.22, then it may well be that later questions of the voluntariness of waiver of *Miranda* rights intended prophylactically to insulate the Fifth Amendment guarantee against compelled self-incrimination ought also to be regarded as within its scope. Thus, Article 38.22, §§ 6 & 7, could be read to contain:

> "two separate and distinct directions to a trial court in charging a jury with respect to statements and confessions. Section [6] [is] limited to those cases 'where a question is raised as to the voluntariness of a confession or statement,' whereas Section [7] broadly direct[s] an appropriate instruction on the more general law[.]"

*Moon v. State*, supra at 574 (Clinton, J., concurring). By this construction we could hold that a charge on the voluntariness, *vel non*, of waiver of the Fifth Amendment right to counsel is authorized, where raised by the evidence, under Article 38.22, § 7, if not § 6. The parties have not briefed this issue, however, and we need not decide it today, since in any event the evidence before the jury here did not raise the issue of voluntariness of the waiver. See text, *post*.

**16.** As we understand him, appellant complains that at the trial Merillat testified that the task force "suggested" that Merillat return to the Goree Unit to talk to appellant on March 27. At the pre-trial hearing, appellant contends, Merillat testified instead that he had been "advised" to do so. Assuming this is accurate, the precise significance of this distinction as it relates to the voluntariness of appellant's waiver of the right to counsel before making a formal statement eludes us. There was no evidence presented either at the pre-trial hearing or at trial that appellant was unwilling to speak to Merillat informally without counsel.

evidence to support it, no instruction under Article 38.22, §§ 6 or 7, supra, was required. *Hernandez v. State*, 819 S.W.2d 806 (Tex.Cr. App.1991); *Brooks v. State*, supra. We therefore overrule appellant's sixth point of error.

### III. PUNISHMENT

 In his fifth point of error appellant complains of the admission at the punishment phase of a drawing made by appellant which the prosecutor characterized during his closing argument, *sans* objection, as a "self portrait." Approximately six feet in height, on butcher paper, the drawing depicts, in the words of appellant's brief, "a large green monster holding a bloody-bladed axe in one hand and the scalp of a woman in the other with a body wrapped in the tail." [17] A vocational instructor from the Texas Department of Corrections testified that during appellant's first stint in the penitentiary he requested that appellant draw something he could put on his front door as a Halloween decoration. He did not suggest what appellant should draw, however. At the time the drawing was admitted appellant objected, *inter alia*, that it was not sufficiently reliable to pass Eighth Amendment muster, citing *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). He makes the same basic contention on appeal.

 Appellant does not contest the relevance of the drawing to the second special issue, which inquires "whether there is a probability that [he] would commit criminal acts of violence that would constitute a continuing threat to society." See former Article 37.071, § (b)(2), supra. Probable future conduct is a permissible consideration in deciding whether death is an acceptable punishment in a particular case, under the Eighth Amendment. E.g., *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Nor does appellant specify in what respect the drawing is unreliable evidence as it bears on this issue. He does complain he was "deprived of his constitutional rights of

confrontation and cross-examination concerning" the drawing, but this is a Sixth Amendment claim, not preserved by the objection he made at trial. Moreover, appellant did cross-examine the vocational instructor at the punishment phase of trial, eliciting testimony that appellant displayed positive character traits in prison, that he made other, benign drawings there, and that the instructor "had no problem" putting the particular drawing at issue here on his front door at Halloween for children to see.

In *Booth v. Maryland*, supra, the Supreme Court ruled that victim impact statements were inadmissible at the punishment phase of a capital case because of the risk that such evidence will only divert the sentencing jury from its constitutionally mandated task to appraise the character of the defendant and his crime. We see no such risk here. Appellant's drawing has an inferential bearing on his character for violence, which relates in turn to the question of future dangerousness. In any event, the Supreme Court reversed itself four years later, overruling *Booth* and holding that "[t]here is no reason to treat [victim impact] evidence differently than other relevant evidence is treated." *Payne v. Tennessee*, 501 U.S. 808, at ——, 111 S.Ct. 2597, at 2609, 115 L.Ed.2d 720, at 736 (1991). Appellant's drawing was relevant to the second special issue, and we perceive no Eighth Amendment bar to its admission. We therefore overrule appellant's fifth point of error.

 In his eighth through twelfth points of error, inclusive, appellant challenges admissibility of evidence of two offenses committed when he was a juvenile, including the 1975 abduction, rape and assault of a high school classmate. The evidence took the form of live testimony from the victims themselves, a pen packet showing the 1975 conviction, and portions of appellant's videotaped confession of April 27, 1989. He claims use of juvenile misconduct as an aggravating factor in a capital punishment proceeding violates the Eighth Amendment, again citing *Booth v. Maryland*, supra, as well as *Thomp-*

---

17. The original exhibit itself has not been forwarded to this Court. Appellant asks that we direct the trial court to send it to us that we may appreciate its full effect. However, in his brief

appellant has attached a reproduction on 8½″ by 11″ paper which we find adequate for appellate purposes, in view of our disposition, *post*.

*son v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

Again, appellant does not dispute the relevance of this evidence to the second special issue. For the reasons given in our treatment of his fifth point of error, we also reject *Booth v. Maryland,* supra, as the basis for any Eighth Amendment claim. Nor do we believe the holding, such as it is, in *Thompson v. Oklahoma,* supra, advances appellant's claim here. In *Thompson* a plurality of the Supreme Court held that the Eighth Amendment categorically prohibits execution of an offender who was younger than sixteen years of age when he committed the offense. Justice O'Connor concurred on the narrower ground that the Oklahoma legislation under review did not reflect "the earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty." 487 U.S. at 857, 108 S.Ct. at 2711, 101 L.Ed.2d at 734. One term later, in *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), a majority of the Court concluded there is no categorical prohibition against execution of offenders sixteen years of age or older. The record shows appellant was twenty-eight and twenty-nine years old when he committed the murders for which he has been assessed the death penalty in this cause. *Thompson* does not stand for the proposition that use of juvenile misconduct to help resolve a fact issue at the punishment stage of trial violates the Eighth Amendment in any respect. Appellant cites no other authority for this proposition, and we know of none.[18] We therefore overrule his eighth through twelfth points of error.

■ In his seventh point of error appellant complains that the trial court failed to submit definitions in its charge to the jury at the punishment phase of the terms "future dangerousness," "probability," "criminal acts of violence," and "continuing threat to society." See former Article 37.071, § (b)(2), supra. There was no need for the trial court

to define "future dangerousness," as that term does not appear in the statute, but is only a shorthand rendition used frequently by this Court to denominate the second special issue in general. We have persistently held that failure to define the terms that are to be found in Article 37.071, § (b)(2), does not render that provision unconstitutionally vague under the Eighth and Fourteenth Amendments. E.g., *Caldwell v. State,* 818 S.W.2d 790, at 797–99 (Tex.Cr.App.1991); *Lewis v. State,* 815 S.W.2d 560, at 562–63 (Tex.Cr.App.1991); *Smith v. State,* 683 S.W.2d 393, at 410–11 (Tex.Cr.App.1984). Accordingly, we overrule appellant's seventh point of error.

■ Finally, in appellant's second point of error he contends the trial court erred in denying his motion for mistrial following alleged improper argument by the prosecutor at the punishment phase of trial. Toward the end of his rebuttal argument the prosecutor alluded to the three killings for which appellant was on trial, concluding with the murder of Risinger in October of 1987. He then mentioned the October 1988 aggravated sexual assault during which appellant nearly killed a Texas A & M co-ed, which had been proven at the punishment phase, and remarked:

"... Ladies and gentlemen, I think you can reasonably assume from the evidence that there are more dead women out there that we just haven't found out about. I submit to you that there's no way Daniel Corwin went an entire year based on his track record and the track record that you know—"

At this point counsel for appellant interposed an objection that this argument was outside the record. The trial court immediately sustained the objection and admonished the prosecutor to stay within the record. Appellant requested the jury be instructed to disregard the argument, and the trial court

---

**18.** Appellant does cite *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), but *Gardner* is a due process case. We have held that admission of prior unadjudicated misconduct at the punishment phase of trial pursuant to Article 37.071, supra, does not violate due pro-

cess. E.g., *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981). Appellant does not explain how the fact the unadjudicated offenses were committed when appellant was a juvenile changes the due process calculus.

immediately did so. The trial court then denied appellant's motion for mistrial.

Appellant presents us with no reason we should not follow the general appellate presumption that a trial court's instruction to disregard an improper jury argument will be efficacious. *Gardner v. State,* 730 S.W.2d 675, at 696 (Tex.Cr.App.1987). Here the prosecutor invited the jury to infer from appellant's pattern of past misconduct other incidents of past misconduct not affirmatively established by the record. This reasoning is not unlike that by which a jury may validly predict future behavior from past misconduct. To the extent the prosecutor's remark invited the jury to speculate as to unproven past misconduct and factor *that* into its prediction as to appellant's future conduct, however, it may well have been improper. But we cannot say the remark was so inflammatory that the jury could not consciously discount it in its deliberations in accordance with the trial court's timely instruction to disregard. *Gardner v. State,* supra. We therefore overrule appellant's second point of error.

The judgment of the trial court is affirmed.

MILLER, J., concurs in the result of the fifth point of error and otherwise joins the opinion.

BAIRD, Judge, concurring.

I write separately to further address appellant's fifth point of error.

## I.

The majority states that appellant does not "specify in what respect the drawing is unreliable evidence as it bears on this issue." Majority op. pg. 35. I disagree. Appellant specifically contends the drawing lacks the standard of reliability required by the Eighth Amendment in capital cases. Appellant's brief pgs. 41–42. In support of that proposition appellant relies on *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and several other cases from the United States Supreme Court. Appellant's brief pgs. 44–45.

In *Booth,* the United States Supreme Court considered whether the admission of a victim impact statement at the punishment phase of a capital murder trial violated the Eighth Amendment. *Id.,* 482 U.S. at 501–502, 107 S.Ct. at 2532. The Court stated:

... [W]hile this Court has never said that the defendant's record, characteristics, and the circumstances of the crime are the *only* permissible sentencing considerations, a state statute that requires consideration of other factors must be scrutinized to ensure that the evidence has some bearing on the defendant's "personal responsibility and moral guilt." To do otherwise would create the risk that a death sentence will be based on considerations that are "constitutionally impermissible or totally irrelevant to the sentencing process."

*Id.,* 482 U.S. at 502, 107 S.Ct. at 2532–2533 (citations omitted; emphasis in original). The Court found victim impact statements contained information which was unknown to the defendant; irrelevant to his decision to commit the offense; and, difficult to rebut. The statements could divert the jury's attention away from its "... constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime." *Id.,* 482 U.S. at 507, 107 S.Ct. at 2535. The Court found that the conclusions the jury could draw "from the evidence clearly is inconsistent with the reasoned decision making we require in capital cases," and held the admission of such evidence violated the Eighth Amendment. *Id.,* 482 U.S. at 508–509, 107 S.Ct. at 2536.

As the majority notes, the Supreme Court overruled *Booth* in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), holding that the exclusion of victim impact statements "deprive[d] the State of the full moral force of its evidence and ... prevente[d] the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Id.,* 501 U.S. at ——, 111 S.Ct. at 2608. The Court noted that "the assessment of harm caused by the defendant" has historically been an appropriate consideration in the assessment of punishment and that, although the capital defendant is entitled to

individualized consideration, such consideration is not "wholly apart from the crime which he ha[s] committed." *Id.*, 501 U.S. at ——, 111 S.Ct. at 2605–2607.

The *Payne* Court, however, did not alter the requirement that capital punishment evidence be reliable. The Supreme Court has stated:

> ... Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference *in the need for reliability* in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).[1] The Eighth Amendment requires that the jury "have adequate guidance to enable it to perform its sentencing function" to avoid the arbitrary infliction of the death penalty. *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). *See also, Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (decided in conjunction with *Branch v. Texas* ).

### II.

In the instant case the State admitted a six foot drawing by appellant and later argued the drawing was a "self portrait." (*See,* appendix.) The drawing was completed in 1981 or 1982, six or seven years before the commission of the instant offenses, at the request of Mark LeNorman, an instructor at the Texas Department of Corrections Windham School System. Although LeNorman did not "suggest what appellant should draw," Majority opinion pg. 35, the State concedes appellant was asked to draw "... something for Halloween." State's Brief pg. 33. The State offered no testimony, expert or otherwise, interpreting the drawing. Nevertheless, the State argued:

> ... Presented the, what I call the self portrait. A real indication ... I submit to you this shows what [appellant] comes up when he's asked to create something on his own devices. Not following or copying some model. He comes up with a monster.

That creature lives within [appellant]. We don't have any way available to us to exorcise that demon from within [appellant]. But we certainly have a way, and you have a way, by answering yes and yes to those special issues of exorcising [appellant] from our society. I submit that's what you should do.

### III.

The majority holds, without citation to authority, that "[a]ppellant's drawing has an inferential bearing on his character for violence, which relates in turn to the question of future dangerousness." Majority opinion pg. 35. I disagree. The only evidence presented regarding this drawing was that it was intended to be a Halloween decoration. There is no showing that the drawing is reliable punishment evidence relative to the second punishment issue. *See,* Tex.Code Crim.Proc.Ann. art. 37.071(b)(2). Pure speculation, devoid of any factual basis, does not provide the reliability required under the Eighth Amendment. *See, Woodson*, 428 U.S. at 305, 96 S.Ct. at 2991. Further, a defendant's drawings have not historically been an appropriate consideration in the assessment of punishment. *Compare Payne*, 501 U.S. at ——, 111 S.Ct. at 2608.

In light of the foregoing authority, it is clear that the evidence presented at the punishment phase of a capital trial must be reliable. Since there was no showing that the drawing, drawn at the request of a third party six years prior to the date of the instant offenses, was reliable evidence of appellant's "personal responsibility and moral guilt," I believe the trial judge erred in admitting the drawing. *Booth*, 482 U.S. at 502, 107 S.Ct. at 2533.

### IV.

The question becomes whether the admission of the drawing contributed to appellant's punishment. Tex.R.App.P. 81(b)(2). The record demonstrates that appellant murdered three separate women by stabbing them; two of the women were found nude or semi-nude. Further, the State proved three

---

**1.** *All* emphasis is supplied unless otherwise indicated.

other instances where appellant physically and sexually assaulted women at knife-point. Based upon this evidence, as well as the statements given by appellant, I find beyond a reasonable doubt that the error in admitting the drawing did not contribute to appellant's punishment. With these comments, I concur in the disposition of appellant's fifth point of error.

I also concur only in the disposition of Part II, B, ii of the majority opinion and otherwise join that opinion.

MALONEY, J., joins this opinion.