IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO.74,936






DAMON ROSHUN MATTHEWS, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM HARRIS COUNTY






Keller, P.J., delivered the opinion of the unanimous Court.


O P I N I O N



 Appellant was convicted in April 2004 of capital murder. (1) Pursuant to the jury's answers to
the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e),
the trial judge sentenced appellant to death. (2) Direct appeal to this Court is automatic. (3) Appellant
raises ten points of error. Finding no merit in appellant's claims, we shall affirm.

I. SUFFICIENCY OF THE EVIDENCEA. Background

 Viewed in the light most favorable to the verdict, the evidence at trial shows the following:
Appellant and the victim, Esfandiar Gonzalez, grew up together and had known each other since
elementary school. Gonzalez lived with his parents, worked full-time at a Kroger grocery store, and
had no criminal history. On March 6, 2003, at around 6:50 p.m., Gonzalez drove his Oldsmobile
to Kroger, and picked up and cashed his paycheck for $211.61. Around 7:00 p.m., Gonzalez talked
to appellant on the phone. Twenty minutes later, Gonzalez called his mother and told her that he was
going with a friend to look at some speakers for his car. 

 Gonzalez drove to a Super 8 motel in Sharpstown at around 9 p.m. and picked up appellant,
who was staying in room number 243. They drove to a parking lot at 12400 Sharpview. While they
were parked, Gonzalez sat in the driver's seat of the car. Appellant got out of the car and stood
outside the front passenger side door. Appellant then pointed a gun at Gonzalez through the half-opened passenger window and shot him in the head seven times, killing him. 

 Blood spatter evidence on Gonzalez's clothes and body indicated that Gonzalez had been
sitting in an upright position when he was shot and that Gonzalez's body had been pulled out of the
car and dumped at the scene. Blood stains on appellant's shorts and spatterings on the side of his
tennis shoes were consistent with appellant shooting Gonzalez while he sat in the driver's seat,
pulling his body out of the car, and tipping the body, causing blood to run from his head. Blood
stains on the shoulder seat strap of the driver's seat of the Oldsmobile and high velocity specks on
the overhead liner were consistent with someone being shot at close range while sitting in the
driver's seat. The stains on the passenger's seat were consistent with the passenger's door being
closed and the shooter leaning down and shooting through the passenger's window.

 Around 10 p.m., appellant drove Gonzalez's car to his motel room. Weirleis Flax, who was
staying in the same room, was there when appellant came inside and changed his clothes and shoes. 
Appellant placed his clothes and shoes in a pile and then left the motel.

 Meanwhile, Kalen Hutchenson, who lived in a house at 12400 Sharpview, heard a cell phone
ringing at around 9:30 p.m. and stepped outside to see where the cell phone was. He discovered
Gonzalez's body in the parking lot. He took Gonzalez's cell phone and called 911, and waited for
the police to arrive. Officer Andrew Taravella and Sergeant Hub Mayer arrived at the scene. They
found no firearms evidence - no shell casings or bullet strikes - in the surroundings of the nearby
buildings. In Gonzalez's pocket they found a piece of paper with the number 243 on it and a dollar
in change. While they were investigating the scene, Gonzalez's cell phone rang; the officers
answered it. It was Caesar, Gonzalez's brother. Upon talking to Caesar, the officers realized that
Gonzalez's car was missing from the scene, so they dispatched a description of Gonzalez's
Oldsmobile over the radio. 

 Around 1:00 a.m., Deputy David Mash was patrolling the area when a young male, Javier
Sasedo, approached him and told him that his friend had been murdered a few hours earlier and that
he had just seen someone driving his friend's car into a do-it-yourself carwash on Dashwood, about
a block away. Mash notified dispatch and requested assistance from back-up units. He then drove
to the carwash and saw appellant in one of the carwash stalls washing blood out of Gonzalez's car. 
Mash apprehended appellant and put him in the back seat of the patrol car. When back-up units
arrived, the officers took photographs of Gonzalez's car and looked into the driver's side of the car. 
They saw that there was blood that started from the driver's side and ran to the passenger's side. The
officers also recovered a gun, a Davis .380, from the floorboard of the driver's side of Gonzalez's
car, and they recovered a fired .380 shell casing in the back of the car. The gun was later determined
to be the murder weapon.

 Around 2:00 a.m. at the scene, Mayer interviewed appellant and taped the interview. (4) In his
oral statement, appellant denied any involvement in Gonzalez's murder. He said that a short
Hispanic male, with a bald head and gold in his mouth, named "Creeper," (5) came over to the motel
in Gonzalez's car and asked him if he wanted to "pimp the car for a little bit." At first, appellant
claimed that he did not know that the car belonged to Gonzalez. He said that he drove the car for
a few minutes, before he noticed the blood on his hands and on the car. He then took the car to the
carwash to wash out the blood. When the police arrived, he denied any knowledge of the gun on the
floorboard. He stated that he never fired a weapon that night. When asked about the identity of
"Grumpy," a nickname of Gonzalez, appellant said he did not know who Grumpy was. He later
admitted that Grumpy had called him earlier that day and that he had known Grumpy since they were
in school together. 

 After the interview, Mayer went to the motel room at the Super 8. Flax opened the door and
consented to the entry and search of the room. Flax indicated that appellant had come over, changed
his clothes and shoes, and left again. Appellant's clothes and shoes were recovered from the room. 
Testing revealed that the clothes and shoes recovered from the motel room and the clothes appellant
wore at the time of his arrest had Gonzalez's DNA on them. 

 Around 5:00 a.m., Police Officer Norman Ruland interviewed appellant on video. (6) In his
videotaped statement, appellant changed his story multiple times. At first, appellant told Ruland
that, around 7:00 p.m., Grumpy picked up appellant and asked him where to get cocaine. (7) Appellant
then took Gonzalez to see Creeper and a guy named "T-Man." Appellant stayed in the car while
Gonzalez talked to Creeper and T-Man. According to appellant, before Gonzalez returned to
Creeper, he took appellant to the motel room that appellant shared with Flax. Creeper then drove
to the motel in Gonzalez's car and asked appellant if he wanted a ride. Appellant took the car for
a ride. When he noticed the blood on his hands and clothing, he took the car to the carwash. 

 After further questioning, appellant claimed that he heard gunfire when Gonzalez, Creeper
and T-Man were talking and he was sitting in the car. According to appellant, Creeper shot at
Gonzalez, and Gonzalez shot at Creeper, and then Gonzalez went to the car, shouted to appellant that
he had set him up, and shot two or three times at appellant. Everyone was outside the car at this
time, and appellant shot his gun, "a little .25," once in self-defense, before he threw down his gun
and ran back to the motel. He claimed that he did not know that Gonzalez was dead or who shot
Gonzalez. He also claimed that he did not know that the car was full of blood or who owned the gun
on the floorboard, although he speculated that the gun belonged to Creeper. Appellant later said that
Gonzalez and Creeper were members of the La Primera gang (8) and therefore friends. He admitted
that it did not make sense that Creeper would kill Gonzalez and take his car to appellant, a non-member of the gang. He then recalled that it was an unknown black man, not Creeper, who brought
Gonzalez's car, full of blood, to him and asked him if he wanted a ride. He then drove Gonzalez's
car to the carwash. 

 Dr. Ana Lopez, assistant medical examiner at the Harris County Medical Examiner's Office,
performed an autopsy of Gonzalez's body on March 7, 2003, and determined that he had six gunshot
wounds on the right side of his head, another gunshot wound on the top of his head, a contusion on
his shoulder and some abrasions on his back. She concluded that two of the gunshot wounds were
surrounded by multiple stippling marks and no soot, indicating a proximity of the gun to Gonzalez
of approximately one to three feet. Five of the bullets were recovered from the neck, suggesting that
the bullets traveled from the right side of his face to the left and downward, consistent with an
individual standing and shooting downward to someone who is sitting. Six of the seven gunshot
wounds were characterized as fatal. 

 The record, viewed in a neutral light, reveals the following evidence favorable to appellant.
In both statements to the police, appellant repeatedly denied killing Gonzalez. A fingerprint lifted
on the outside of the driver's door and submitted for latent examination had insufficient
characteristics to be identifiable. No fingerprints were lifted from the .380 or the bullets. Dr. Eric
Sappenfield, a trace section supervisor for the Harris County Medical Examiner's Office, analyzed
samples submitted from appellant's hands on March 6, 2003, for gunpowder residue under a
scanning electron microscope. The results were "inconclusive," meaning gunpowder residue was
either not present or it could not be determined whether it was present. (9) Finally, Lawrence Renner,
a blood stain expert, determined that the blood stain on appellant's sweatshirt was a transfer pattern
stain, caused by something with blood on it touching the surface of the sweatshirt. There was no
blood spatter on the sweatshirt, though there should have been if appellant was wearing the
sweatshirt while shooting Gonzalez from one to three feet away. (10) 

B. Analysis


 In points of error one and two, appellant contends that the evidence is legally and factually
insufficient to sustain his conviction for capital murder. Evidence is legally insufficient if, viewed
in the light most favorable to the prosecution, no rational jury could find the defendant guilty beyond
a reasonable doubt. (11) Under a factual sufficiency review, we consider all of the evidence in a neutral
light and ask whether the jury was rationally justified in finding guilt beyond a reasonable doubt. 
There are two ways in which the evidence may be factually insufficient. (12) First, when considered
by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a
reasonable doubt. (13) Second, there may be both evidence supporting the verdict and evidence
contrary to the verdict. (14) If, in weighing all the evidence under this balancing scale, the contrary
evidence is strong enough that the beyond-a-reasonable-doubt standard could not have been met, the
guilty verdict should not stand. (15) We find appellant's claims of legal insufficiency and factual
insufficiency to be without merit.

 Appellant argues that the evidence is legally insufficient because: (1) there was no direct
evidence that appellant personally shot Gonzalez; (2) appellant denied killing Gonzalez in his
statements to the police; and (3) the evidence supports the defense theory that appellant merely
moved Gonzalez's car or body, and such evidence might implicate appellant as a party or would have
supported a conviction for theft or unauthorized use of a motor vehicle. 

 In reviewing the legal sufficiency of the evidence, we look at the events occurring before,
during, and after the commission of the offense. (16) Circumstantial evidence alone can be sufficient
to establish guilt. (17) Each fact does not need to point directly and independently to the guilt of the
appellant as long as the cumulative effect of all the incriminating facts are sufficient to support the
conviction. (18) 

 Viewing the evidence in the light most favorable to the verdict, we find that the evidence is
legally sufficient to sustain the conviction of capital murder. There was evidence that appellant and
Gonzalez talked on the phone. Gonzalez called his mother to tell her that he was going with a friend
to look for speakers for his car. Appellant confessed that Gonzalez picked appellant up from a Super
8 motel in Sharpstown. Gonzalez later was found dead at a parking lot on Sharpview; he had the
number 243 on a piece of paper in his pocket - the room number in which appellant was staying. 
Appellant confessed that he drove Gonzalez's car to the motel room to change out of his bloody
clothes and shoes; DNA testing revealed that these items had Gonzalez's DNA on them. Appellant
then drove Gonzalez's car to a car wash and attempted to wash all of the blood out of the car, at
which time he was apprehended by the police. The murder weapon was recovered on the floorboard
of Gonzalez's car. 

 Appellant gave the police two statements, in which he changed his story multiple times. He
ultimately stated that he was present at the scene of the shooting and that he fired a shot and left the
scene in Gonzalez's car. The cumulative effect of all of these incriminating facts are sufficient to
support appellant's conviction. Point of error one is overruled.

 Appellant argues that the evidence is factually insufficient because: (1) appellant denied
killing Gonzalez in his statements; (2) the defense offered an alternative theory that Gonzalez was
involved in drugs and the La Primera gang and was killed by someone named "Creeper" or some
other unknown gang member; and (3) the defense presented testimony by defense expert, Larry
Renner, that contradicted the State's blood-spatter expert testimony.

 In reviewing the evidence for factual sufficiency, we do not "find" facts or substitute our
judgment for that of the fact finder. (19) The jury is the sole judge of the weight and credibility to be
given to a witness's testimony. (20) 

 The jury could accept or reject any or all of the statements that the appellant made in his tape-recorded and videotaped statements. (21) Looking at the evidence in a neutral light, we conclude that
the jury was rationally justified in finding guilt beyond a reasonable doubt, and thus the evidence is
factually sufficient to sustain the conviction for capital murder. Point of error two is overruled. 

II. LESSER-INCLUDED OFFENSES In points of error three through five, appellant contends that the trial court erred in refusing
to submit his requested instruction regarding the lesser-included offenses of theft and unauthorized
use of a vehicle. Point three raises a state-law claim while points four and five allege violations of
the Federal Constitution, specifically the due process clause of the Fourteenth Amendment and the 
Eighth Amendment prohibition against cruel and unusual punishment.

 At the conclusion of the evidence, appellant requested that the trial court include instructions
in the jury charge on murder, theft, and unauthorized use of a motor vehicle. The trial court granted
defense counsel's request for a charge on murder but denied appellant's request for charges on theft
and unauthorized use of a motor vehicle.

 Under state law, a lesser-included offense must be included in the jury charge if: (1) the
requested charge is for a lesser-included offense of the charged offense; and (2) there is some
evidence that, if the defendant is guilty, he is guilty only of the lesser offense. (22) In other words, there
must be some evidence from which a jury could rationally acquit the defendant of the greater offense
while convicting him of the lesser-included offense. (23) 

 To convict appellant of capital murder, the jury was required to find beyond a reasonable
doubt that appellant intentionally caused the death of Esfandiar Gonzalez while in the course of
committing or attempting to commit robbery. Robbery is a lesser-included offense of murder in the
course of robbery. Theft is a lesser-included offense of robbery. (24) But unauthorized use a motor
vehicle is not a lesser-included offense of the capital murder charged in this case, since it is not
included in the proof necessary to establish that the defendant intentionally committed murder in the
course of committing or attempting to commit robbery. (25) The trial court therefore did not violate
state law in denying appellant's request for an instruction on unauthorized use of a motor vehicle.

 Although theft is a lesser-included offense of robbery, there is no evidence here that appellant
is guilty only of the lesser-included offense of theft. To be entitled to a jury instruction on the lesser-included offense of theft, the record must contain evidence that appellant committed a theft of the
victim's property but did not injure or threaten him and did not make him fearful of imminent
physical injury. (26) 

 The evidence shows that appellant admitted in his statements that he shot at Gonzalez and
took Gonzalez's car. There was no evidence from which a jury could rationally acquit appellant of
murder in the course of robbery while convicting him of theft. Thus, the trial court did not violate
state law in refusing appellant's request that the jury be instructed on the lesser-included offense of
theft. Point of error three is overruled.

 With regard to the alleged violations of the Federal Constitution, appellant has not shown that
the trial court's action in refusing appellant's requested instructions denied appellant his due process
rights or violated the prohibition against cruel and unusual punishment. (27)
 Points of error four and
five are overruled. 

III. PUNISHMENT In point of error six, appellant contends that the assessment of the death penalty violated the
Eighth Amendment because of appellant's youth and because the jury's answers to the special issues
may have been based on conduct of appellant occurring when he was seventeen years old or younger. 

 Appellant filed a pretrial motion to quash the indictment and preclude the death penalty as
a sentencing option on the ground that § 8.07(c) (28) of the Texas Penal Code violated the Eighth and
Fourteenth Amendments of the United States Constitution. After the State rested in the guilt phase
of trial, appellant argued the motion and specifically argued that Roper v. Simmons (29) was before the
United States Supreme Court and that the Court would be deciding whether to uphold the imposition
of the death penalty on persons seventeen years old or under. As appellant was eighteen years old
at the time of the offense, the trial court denied the motion. 

 The United States Supreme Court held in Simmons that the Eighth and Fourteenth
Amendments to the United States Constitution "forbid imposition of the death penalty on offenders
who were under the age of 18 when their crimes were committed." (30) Because appellant was eighteen
years old when he committed the offense of capital murder, the holding in Simmons does not apply,
and, therefore, the assessment of the death penalty in this case did not violate the Eighth Amendment
of the United States Constitution. 

 Appellant also asserts that the admission of evidence in the punishment phase of prior bad
acts and prior offenses he committed while he was under the age of eighteen was unconstitutional. 
However, appellant did not object to the admission of the evidence (31) at trial on this basis. 

 To preserve error for appellate review, the complaining party must make a timely, specific
objection and obtain a ruling on the objection. (32) The failure to make an objection at trial on the
grounds complained of on appeal forfeits many claims, including an Eighth Amendment claim of
cruel and unusual punishment. (33) Appellant forfeited his complaint that admission of evidence of
prior bad acts and prior offenses committed as a juvenile violated the Eighth Amendment prohibition
against cruel and unusual punishment. 

 Moreover, appellant's complaint is without merit. Article 37.071 permits the admission of
evidence at the punishment phase of capital cases regarding "any matter that the court deems relevant
to sentence, including evidence of the defendant's background or character. . . ." (34) Youth is neither
a mitigating (35) nor an aggravating factor as a matter of law; rather, the jurors interpret the facts and
determine if youth is a mitigating or aggravating factor, or neither. (36) 

 In the punishment phase of a capital murder trial, the admission of prior offenses committed
when the defendant was a juvenile does not violate the Eighth Amendment if he was assessed the
death penalty for a charged offense that occurred when he was at least eighteen years old. (37) 
Appellant was assessed the death penalty for the charged offense of capital murder, which he
committed when he was eighteen years old. Point of error six is overruled.

 In points of error seven and eight, appellant contends that the trial court erred in failing to
instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation
issue. He argues that the Texas statute (38) is inconsistent with Apprendi v. New Jersey (39) and its
progeny and with the Texas constitutional guarantee of due course of law. Appellant filed a
proposed jury charge (40) regarding the mitigation issue, and the trial court denied the request. The
Apprendi and Blakely claims have been raised and rejected. (41) 

 Appellant also relies on United States v. Booker. (42) He claims that Article 37.071 is a
guidelines-type statute that differs from the Federal Sentencing Guidelines in degree rather than in
kind. 

 In Booker, the Court held that the Sixth Amendment requirement that any fact, other than a
prior conviction, which is necessary to support a sentence exceeding the maximum authorized by
the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved
to a jury beyond a reasonable doubt was incompatible with the Federal Sentencing Act, which called
for promulgation of mandatory federal sentencing guidelines; thus, provisions of the Act that made
guidelines mandatory and set forth the standard of review on appeal would be severed and excised. (43) 
The Supreme Court also reaffirmed its holding in Apprendi that any fact, other than a prior
conviction, which is necessary to support a sentence exceeding the maximum authorized by the facts
established by a plea of guilty or a jury verdict, must be admitted by the defendant or proved to a jury
beyond a reasonable doubt. (44) We have held that Article 37.071 satisfies these requirements. (45) Points
of error seven and eight are overruled. 

 In point of error nine, appellant contends that the trial court erred in failing to instruct the jury
that the State has the burden of proof beyond a reasonable doubt on the mitigation issue because the
Texas statute gives the jury "mixed signals" as to how the mitigation issue is to be applied.

 At trial, appellant requested an instruction on the State's burden of proof on the mitigation
issue, based on Penry v. Johnson, (46) because without this instruction, the mitigation issue gives the
jury, at best, mixed signals as to how the jury is to go about answering the issue. The trial court
denied the request. Appellant claims that the Texas death penalty statute violates the Eighth
Amendment, as interpreted in Penry II, because, in that it is unclear as to the burden of proof, the
mitigation instruction suffers from the same constitutional flaw of sending "mixed signals" to the
jury. We have rejected the argument that the mitigation issue sends "mixed signals" to the jury, and
we have rejected the argument that the failure to assign a burden of proof violates the Eighth
Amendment. (47) Point of error nine is overruled.

 In point of error ten, appellant contends that the punishment charge misinformed the jury by
failing to disclose that each juror could prevent a death sentence by disagreeing with the other jurors,
in violation of the heightened reliability requirement of the Eighth Amendment of the United States
Constitution and the Due Process Clause of the Fourteenth Amendment. We have decided these
claims adversely to this position. (48) Point of error ten is overruled.

 The judgment of the trial court is affirmed.

 Keller, Presiding Judge 

Date delivered: June 28, 2006

Do Not Publish

1. Tex. Penal Code Ann. §19.03(a). 
2. Article 37.071, § 2(g). Unless otherwise indicated all future references to Articles refer 
to Code of Criminal Procedure. 
3. Article 37.071, § 2(h). 
4. Before appellant gave his tape-recorded oral statement, Mayer read appellant his
statutory rights, and appellant stated that he understood them and that he knowingly and
voluntarily waived them. A redacted recording was admitted at trial without objection. 
5. Appellant used the names "Creeper" and "Creepy" interchangeably in his statements. 
Subsequent to appellant's statement, Mayer interviewed "Creeper," named Froylan Bettencourt, a
tall Hispanic male without gold in his mouth. Bettencourt stated that he was not present on the
night of March 6, 2003, and he was not the shooter. He was eliminated by Mayer as a suspect. 
6. Ruland read appellant his statutory rights, and appellant voluntarily waived those rights
and gave a videotaped statement. The tape was admitted at trial.
7. A postmortem toxicology examination revealed that there was no cocaine or any other
type of drug or alcohol in Gonzalez's blood.
8. At trial, the defense suggested that Gonzalez's death was tied to his membership in the
La Primera gang. The defense presented testimony by Dwight Stewart, a training specialist for
the Texas School Safety Center and instructor of gang awareness, that Gonzalez had tattoos on
his body signifying that he was a member of La Primera. However, Officer Ruland, who had
worked in the divisional gang unit of the Houston Police Department, testified for the State that
none of the tattoos found on Gonzalez's body signified that he was a member of the La Primera
gang. Caesar Gonzalez also testified that his brother was not in a gang. And Kim Whitehead,
assistant principal and gang education awareness representative at Gonzalez's school, testified
that, after counseling Gonzalez, she determined that, because he wore white and had friends in
the gang, Gonzalez at a prior time may have been associated with the La Primera gang, but his
tattoos did not indicate that he was in a gang.

 
9. Dr. Sappenfield stated on cross-examination that he would not expect to find gunshot
residue on the hands of a person who used a power sprayer to spray out a car at a carwash
because the person's hands would get wet and wash the particles away from the hands.
10. Renner admitted on cross-examination that the variables of wind, air-conditioning, and
the smaller caliber of a gun affect whether blood spatter will reach the clothing of a shooter
standing one to three feet away from the victim. 
11. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
12. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004).
13. Id.
14. Id.
15. See id. at 485.
16. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 1999).
17. See id.
18. See id.
19. See Zuniga, 144 S.W.3d at 482.
20. See Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).
21. See id. 
22. See Hayward v. State, 158 S.W.3d 476, 478 (Tex. Crim. App. 2005); Rousseau v.
State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993).
23. Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).
24. Tex. Penal Code Ann. § 29.02. 
25. Tex. Penal Code Ann. § 31.07; see also Rousseau, 855 S.W.2d at 673. 
26. Tex. Penal Code Ann. § 31.03(a). 
27. See Wesbrook v. State, 29 S.W.3d 103, 112-13 (Tex. Crim. App. 2000). In Wesbrook,
this Court rejected appellant's argument that the t
rial court erred in failing to declare the Texas
death penalty statute unconstitutional on the grounds that it violated the Eighth and Fourteenth
Amendments to the United States Constitution. Appellant claimed that he was denied due
process and equal protection and was subjected to cruel and unusual punishment because, at both
the guilt and punishment phases, he was prevented from submitting special instructions to the
jury on the issue of sudden passion arising out of adequate cause. This Court rejected his claim
because, inter alia, he failed to explain how he was denied due process or subjected to cruel and
unusual punishment, and the Court could discern no indications that the refusal to instruct the
jury on sudden passion constituted cruel and unusual punishment.

28. Section 8.07(c), at the time of the offense, provided that, "No person may, in any case,
be punished by death for an offense committed while he was younger than 17 years." Texas
Penal Code § 8.07(c) (Vernon 2003). The amendment to § 8.07(c), made in response to
Simmons, applies to offenses occurring on or after September 1, 2005; it provides that, "No
person may, in any case, be punished by death for an offense committed while he was younger
than 18 years."
29. 543 U.S. 551 (2005).
30. Id. at 578.
31. The State offered and the trial court admitted: appellant's school records, reflecting
numerous school violations and suspensions; judgments in which courts found appellant engaged
in delinquent conduct for possession of marijuana and carrying a handgun; appellant's juvenile
probation records, revealing numerous probation violations; an order certifying appellant as an
adult for prosecution of two aggravated robberies; testimony by the two victims of the aggravated
robberies; and, testimony by officers regarding appellant's arrest in the aggravated robberies.
32. Tex. R. App. P. 33.1(a).
33. Curry v. State, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995).
34. Article 37.071 § 2(a)(1). 
35. Under Article 37.071, § 2(f)(4), mitigating evidence is "evidence that a juror might
regard as reducing the defendant's moral blameworthiness."
36. See Moore v. State, 999 S.W.2d 385, 406 (Tex. Crim. App. 1999). 
37. See Corwin v. State, 870 S.W.2d 23 (Tex. Crim. App. 1993).
38. Article 37.071, § 2(e)(1), requiring the mitigation special issue to be submitted to the
jury, asks: "Whether, taking into consideration all of the evidence, including the circumstances of
the offense, the defendant's character and background, and the personal moral culpability of the
defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a
sentence of life imprisonment without parole rather than a death sentence be imposed."
39. 530 U.S. 466 (2000).
40. Appellant's proposed jury charge provided: 

 Regarding the comparison of mitigating evidence and aggravating evidence, the
State has the ultimate burden of proof to convince you, beyond a reasonable
doubt, that any mitigating considerations are not sufficient to justify a sentence of
life imprisonment rather than the death penalty. This does not mean that the State
must negate any possible mitigating consideration, whether or not it is raised by
evidence. Rather, the special issue asks you to make a comparative judgment
between factors on either side of the question which actually have been raised by
some evidence. If, after a thorough review of the evidence on both sides of the
question, you believe that there are sufficient mitigating considerations, or you
have a reasonable doubt as to how to resolve the comparison which you must
make under the special issue, then you should answer this special issue
affirmatively.
41. See Woods v. State, 152 S.W.3d 105, 120 (Tex. Crim. App. 2004); Hankins v. State,
132 S.W.3d 380 (Tex. Crim. App. 2004); Rayford v. State, 125 S.W.3d 521, 533-34 (Tex. Crim.
App. 2003); Resendiz v. State, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 1032 (2004). 
42. 543 U.S. 220 (2005). 
43. Id. at 245. 
44. See id. at 244-45. 
45. See Woods, 152 S.W.3d at 120.
46. ("Penry II"), 532 U.S. 782 (2001) (holding that a court-made "nullification
instruction"-a jury instruction to nullify what would otherwise be a factually correct
determination that a defendant would probably be dangerous in the future-was unconstitutional
in that it sent "mixed signals" to the jury).
47. See Perry v. State, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004) (holding "[t]he
mitigation special issue does not send 'mixed signals' because it permits a capital sentencing jury
to give effect to mitigating evidence in every conceivable manner in which the evidence might be
relevant"); see also Woods, 152 S.W.3d at 121-22; Scheanette v. State, 144 S.W.3d 503, 506
(Tex. Crim. App. 2004); Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (the
mitigation issue is constitutional despite its failure to assign a burden of proof); Jones v. State,
119 S.W.3d 766, 790 (Tex. Crim. App. 2003), cert. denied, 542 U.S. 905 (2004).
48. See Busby v. State, 990 S.W.2d 263, 272 (Tex. Crim. App. 1999) (Eighth
Amendment); Moore v. State, 935 S.W.2d 124, 128-29 (Tex. Crim. App. 1996)(due process); see
also Patrick v. State, 906 S.W.2d 481, 494 (Tex. Crim. App. 1995) (same).