# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00586-CR

**Alberto Garcia, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. 9040606, HONORABLE JON N. WISSER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Alberto Garcia guilty of the capital murder of more than one person pursuant to the same scheme or course of conduct. *See* Tex. Penal Code Ann. § 19.03(a)(7(B) (West Supp. 2009). Appellant was sentenced to life imprisonment after the jury returned a negative answer to the future dangerousness issue. *See* Tex. Code Crim. Proc. Ann. art. 37.0711, § 3(b)(2), (g) (West Supp. 2009). Appellant contends that the evidence is legally and factually insufficient to support the guilty verdict. He also contends that the trial court erred by admitting irrelevant and unfairly prejudicial testimony, by admitting autopsy photographs, by overruling his motion to dismiss on speedy trial grounds, and by denying the defense access to confidential information pertaining to a State witness. We overrule these contentions and affirm the conviction.

## BACKGROUND

### *The Murders*

At about 7:20 p.m. on December 17, 1990, a taxicab was seen careening out of control down Metcalfe Street in southeastern Austin. After crossing the street from side-to-side knocking down mailboxes, the cab struck a duplex at the corner of Metcalfe and Catalina and came to rest. Witnesses drawn by the sound of the crash testified that a young Hispanic male opened a rear passenger door and climbed out of the cab. This man told one of the witnesses that the cab driver had had a heart attack. The man was clutching a plastic bag, and more than one witness testified that he appeared to be concealing a firearm. When a witness shouted, "He's got a gun," the man ran down Metcalfe toward an elementary school, then turned into Mabel Davis Park and disappeared. The cab's driver, Eleazar Hinojosa, was found slumped in the front seat, dead. He had been shot three times in the back of the head. Cab company records showed that Hinojosa had been dispatched to an apartment complex on Ventura Drive, just a few blocks away, at 7:00 p.m. that night.

On the afternoon of December 19, 1990, the maintenance man at an apartment complex on South First Street in Austin called the police after seeing blood on the exterior and seats of a taxicab that was parked at the complex. When the trunk of the cab was opened, police found the body of the cab's driver, John Parrish. Parrish had been shot twice in the back of the head and once in the temple. The medical examiner testified that Parrish had been dead several days when he was found. Parrish had last been seen by cab company employees on the afternoon of December 15. A resident of the apartment complex testified that she first noticed the parked cab on the night of December 15, and that it did not appear to have moved since then. Plant material caught in the

2

underbody of the cab and found in Parrish's hands suggests that Parrish had been killed elsewhere, after which the murderer stuffed Parrish's body in the trunk and drove the cab to the location where it was found.

Two .22 caliber bullets were recovered from Hinojosa's body during autopsy, and a third .22 bullet that had exited his skull was found in the cab. The medical examiner recovered three .22 bullets from Parrish's body. Based on the appearance of the wounds, the medical examiner determined that the weapon had been touching or very near the heads of both men when the shots were fired. The State's firearms expert testified that the bullets were too damaged for meaningful comparison. He testified, however, that the three .22 shell casings found in Hinojosa's cab and the single .22 shell casing found in Parrish's cab had been fired from the same weapon.

Police investigating the two murders initially suspected a man named Paul Vallejo. Vallejo was indicted for Hinojosa's murder after he was tentatively identified by eyewitnesses as the man seen running away from the scene. Vallejo was tried and acquitted in 1993.

*Appellant's Identification*

The investigation of these murders remained dormant from 1993 until 2004. In that year, an Austin Police Department cold case investigator asked fingerprint technician Sharon Cook to examine the latent fingerprints collected at the scene of the Hinojosa murder to see if any were suitable for input into the Automated Fingerprint Identification System (AFIS). Cook found several suitable prints and entered them into AFIS. She obtained two "hits." The first was a fingerprint found on the driver's side door of Hinojosa's cab. The person so identified proved to have been living in the duplex struck by the cab. He and his son had opened the door of the cab to check on

3

Hinojosa's welfare. The second "hit" was a fingerprint found on a black plastic bag that had been lying in the back seat of the cab. This print belonged to appellant. Cook testified that she ultimately found five fingerprints on this plastic bag that matched appellant's known prints. Cook added that all but three of the fingerprints found on or in Hinojosa's cab that were suitable for identification belonged to either appellant or the two witnesses; the other three were never identified.

Having identified fingerprints in the Hinojosa case, Cook turned to the latent prints lifted at the scene of the Parrish murder. She found only three prints suitable for identification. One was a palm print on the cab's interior rear-view mirror, which had been broken off the windshield and was found lying in the front seat. Cook determined that this print matched appellant's known palm print. The other two suitable prints were on a paper store receipt found inside the cab. These prints did not match appellant's and were never identified.

Two other fingerprint technicians confirmed Cook's identification of appellant's prints. These prints are the only physical evidence linking appellant to the two murders. DNA testing excluded appellant as the source of hairs collected in Parrish's cab. Cuttings from a glove and stocking mask found in the back seat of Hinojosa's cab were also submitted for DNA testing, but no biological material was found on the glove and DNA found on the stocking did not match appellant.[1]

In 2004, appellant was in federal prison serving a sentence for bank robbery. Jeffrey Rapp, who was in the same prison serving a sentence for marijuana distribution, testified that

---

[1] The only biological evidence positively identified by DNA testing was Parrish's saliva on a cigarette butt. Parrish also could not be excluded as the source of a few of the hairs collected from his cab.

he and appellant met in prison and became friends. Rapp said that he once told appellant that he had been unsuccessful in business and believed that this was due to his being insufficiently ruthless. Rapp testified that appellant "jumped up" and said that "he knew what I meant." Appellant told Rapp that he had made a witness to the robbery lie on the floor of the bank and said, "I should have shot three in his head like that," acting it out. Appellant told Rapp that this witness later identified him, which led to his conviction.

Rapp testified that on another occasion, appellant became angry when an officer searched his cell. When the officer left, appellant turned to Rapp and said, "What you do with a motherfucker like that is put three in the back of his fucking head." Rapp also testified that appellant once told him that a .22 caliber firearm is preferable to a larger weapon. According to Rapp, appellant said, "If I shot you with a .357—and [he] pointed [his finger] at my shoulder like this—he says, You know what would happen? It would go right through. But if I shot you with a .22 it would bounce around inside and do more damage."

Rapp testified that appellant "disappeared from the unit" after telling Rapp that "somebody was trying to set him up for some murders or something in Austin." A few weeks later, Rapp read a newspaper story describing appellant's arrest for the murder of the two cab drivers. After reading that both victims had been shot three times in the back of the head, Rapp said to himself, "[O]h, my God, you know, . . . he did it." Rapp had his mother contact the Austin police and tell them that he had information relevant to the cab driver murders. Rapp acknowledged that when he was first interviewed by the police, he sought to exchange what he knew for a reduction of

5

his sentence. Rapp testified that the officers told him that they could not help him, and that he decided to cooperate in any case. According to Rapp, he received no benefit from having spoken to the police and agreeing to testify.

Stephen Lamariano testified that when he was in his early teens, he and his younger brother Michael lived with their family on Catalina near Mabel Davis Park. Stephen testified, and school records introduced in evidence confirmed, that appellant lived in an apartment complex nearby, at the intersection of Ventura and Mission Hill Drive.[2] Stephen testified that he, Michael, and appellant spent much of their time roaming the neighborhood and the park. In 1987, Stephen married Julie Beall, another resident of the neighborhood, and they eventually moved into an apartment on South First Street, two blocks from the apartment complex where Parrish's body was found.

Beall testified that appellant was a frequent visitor to the apartment she shared with Stephen, and that she and appellant had a sexual relationship. Beall said that appellant came to the apartment one evening in December 1990 wearing bloody clothes and appearing nervous. She heard appellant tell Stephen that "things had gone wrong." Appellant showered at the apartment and put his clothes in a trash bag to throw away. Beall said that after she heard about the cab driver murders, she confronted appellant and he told her, "[Y]es, he was responsible for what I was questioning him of."

Stephen testified that appellant told him in December 1990 that "he had done" the Hinojosa murder. Stephen recounted, "He told me that it was on Metcalfe, parked in front of a

_____

[2] It is unclear from the record whether this was the same apartment complex to which Hinojosa was dispatched on the night of his murder.

6

house—I don't know if he still lived there, Kevin Malloney—and he shot him. The car, I guess he hit the accelerator and went on down the hill and wrecked." Appellant also told Stephen that there were two murders, which surprised Stephen because he had not heard of a second. Stephen testified that appellant told him that he had read in a book that "when you shoot them a certain way they would stiffen up and when you shot them another way, they would relax, and he said he wanted to know if it was true."

Michael Lamariano also testified that appellant told him that he murdered the two cab drivers. Appellant told Michael that he shot both of them in the back of the head with a .22. Michael said that appellant "seemed excited about it."

**SUFFICIENCY OF EVIDENCE**

Appellant contends that the evidence is legally and factually insufficient to prove that he was the person who murdered Hinojosa and Parrish.[3] He further contends that the evidence is legally insufficient to prove that the two murders were committed pursuant to the same scheme or course of conduct.

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a legal sufficiency review, all the evidence is reviewed in the light most

---

[3] This opinion was prepared before the release of the court of criminal appeal's opinion in *Brooks v. State*, No. PD-0210-09, 2010 Tex. Crim. App. LEXIS 1240 (Tex. Crim. App. Oct. 6, 2010).

favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 234 S.W.3d at 778. In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d 1, 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Beall and the Lamariano brothers testified that appellant told them in December 1990 that he killed the two cab drivers. Rapp testified that during conversations in prison, appellant spoke of putting "three in the back of [the] head" and expressed a preference for .22 caliber weapons. These statements to Rapp, although not express declarations of guilt, are incriminating in light of the manner in which the two cab drivers were killed.

The presence of appellant's fingerprints inside both cabs serves to corroborate the testimony regarding appellant's incriminating statements. Appellant seeks to minimize the significance of the fingerprint evidence, arguing that taxicabs are a form of public transportation and he could have left his prints at any time. Nevertheless, it would be a remarkable coincidence for

appellant to have innocently left his fingerprints in both cabs. Moreover, there is other evidence suggesting that appellant left his prints in the cabs at or near the times of the murders.

Appellant's palm print was found on Parrish's rear-view mirror, a place a typical taxicab customer would have no reason or opportunity to touch. Further, the mirror had been broken off the windshield and was lying in the front seat of the cab. Ricardo Rogers, who was the general manager of Parrish's cab company in December 1990, testified that mechanics inspected the cabs weekly when the drivers came to the central office to make their lease payments. He said that a broken rear-view mirror would be noticed and repaired during such an inspection because it is unlawful to operate a cab without one. Although Rogers could not be certain, he said that it was likely that Parrish's cab had been inspected and cleared for use on December 15, 1990, when Parrish made his last lease payment and was last seen alive. The trier of facts could reasonably infer that the mirror had been broken and touched later that day by the murderer.

Appellant's fingerprints were found on a black plastic bag left in the back seat of Hinojosa's cab. Although there was no evidence regarding the maintenance schedule at Hinojosa's cab company, it is reasonable to assume that the cabs were regularly cleaned and that this bag had been left in the cab recently. In addition, witnesses testified that the Hispanic man seen getting out of the cab was clutching a black plastic bag and attempting to conceal a firearm. The jury could reasonably conclude that the plastic bag with appellant's fingerprints had been left behind by the murderer.

A third factor linking appellant to the murders is location. Hinojosa was murdered in the neighborhood in which appellant lived as a teenager. Hinojosa's last fare—his murderer—was picked up at or near the apartment complex in which appellant had lived. Parrish's cab, with his

9

body stuffed into the trunk, was found parked two blocks from where appellant's friends Beall and Stephen Lamariano were living.

Viewing all the evidence in the light most favorable to the verdict, the jury could rationally find beyond a reasonable doubt that appellant murdered Hinojosa and Parrish. Issue two is overruled.

The evidence of appellant's guilt is also sufficient when the record is viewed in a neutral light. Appellant argues that his statements to Beall, the Lamarianos, and Rapp should be given no weight because they lack "corroborative details." He also raises legitimate questions regarding the credibility of these witnesses. Rapp was a convicted felon and admitted that his original motivation for contacting the police was a desire to reduce his own sentence. Beall acknowledged having a conviction for prostitution. Michael Lamariano was a convicted felon, and there is evidence that, unknown to the prosecutors, he was under indictment for felony driving while intoxicated at the time of appellant's trial. Stephen Lamariano was not shown to have a criminal record, but it might be inferred that he held a grudge arising from appellant's sexual relationship with Beall, who was then Stephen's wife. Over the course of fourteen years, Beall and the Lamariano brothers never told the police that appellant had confessed to the murders, and they were evasive and uncooperative when contacted by the police in 2004. The evidence shows that the Lamarianos made their statements incriminating appellant only after having unrecorded conversations with Austin police officers.

It was the jury's responsibility to determine the credibility of Rapp, Beall, and the Lamariano brothers, and the weight to give their testimony. We cannot say that it was clearly wrong or manifestly unjust for the jury to credit this testimony.

10

Appellant also urges that there is physical evidence suggesting that someone else committed the murders. He notes that in addition to his own fingerprints, other prints suitable for identification were found in both cabs but were never identified. As we have already discussed, however, other circumstances suggest that appellant's prints were left at or near the times of the murders. There is no evidence as to when the unidentified prints might have been left in the cabs, and there is no evidence that the unidentified prints were left by the same person. Nor is it necessarily exculpatory that appellant's DNA was not found in any of the hairs collected from Parrish's cab or on the stocking mask and glove found in Hinojosa's cab. The presence of his fingerprints shows that appellant was in the cabs, and it is not unreasonable to believe either that he did not leave any biological evidence behind or that it went undiscovered.

Viewing all the evidence in a neutral light, the evidence of appellant's guilt is not so weak as to make the jury's verdict clearly wrong or manifestly unjust, nor is the verdict against the great weight and preponderance of the available evidence. Issue three is overruled.

Finally, we turn to appellant's contention that the State failed, as a matter of law, to prove that the murders were committed "during different criminal transactions but . . . pursuant to the same scheme or course of conduct." Tex. Penal Code Ann. § 19.03(a)(7)(B). Appellant notes that while Hinojosa was clearly shot while driving his cab, the circumstances of Parrish's murder are less clear. Appellant argues that "to infer that the killer was pursuing any common scheme or sequence of behavior . . . would necessarily involve guesswork beyond the superficial similarities."

The court of criminal appeals has written that section 19.03(a)(7)(B) was meant to embrace "serial" murders, those that are committed pursuant to a regular mode or pattern of behavior. *Corwin v. State*, 870 S.W.2d 23, 28 (Tex. Crim. App. 1993). Referring to the evidence

11

in that case, the court wrote, "In abducting, raping, and killing or attempting to kill five women in more or less the same way over the course of some thirteen years, . . . [the defendant] can reasonably be said to have engaged in a 'regular mode or pattern of . . . behavior.'" *Id.* In *Feldman v. State*, the defendant shot and killed a truck driver in a fit of road rage, then fatally shot a second truck driver he encountered at a service station forty-five minutes later. 71 S.W.3d 738, 751 (Tex. Crim. App. 2002). The court held that a rational trier of fact could conclude that the two murders were committed "pursuant to the same over-arching objective or motive and, hence . . . pursuant to the same scheme or course of conduct." *Id.* at 754.

Over the course of two days, appellant engaged two taxicabs and then shot both drivers three times in the head at close range with the same .22 caliber firearm. Stephen Lamariano testified that appellant told him that he shot the cab drivers to see the reaction of the bodies. This evidence demonstrates both a regular mode or pattern of behavior and an over-arching objective or motive. The jury could rationally conclude beyond a reasonable doubt that appellant shot Hinojosa and Parrish pursuant to the same scheme or course of conduct. Issue one is overruled.

## RAPP'S TESTIMONY

Appellant contends that the trial court erred by admitting Rapp's testimony recounting the statements appellant made to him in prison. According to appellant, this testimony was both irrelevant and unfairly prejudicial. We review the court's decision to admit the testimony for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

12

Evidence is relevant if it has any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. The evidence need not in itself prove or disprove a particular fact of consequence; it is sufficient if the evidence provides a small nudge toward proving or disproving that fact. *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

The fact of consequence here was appellant's identity as the person who shot Hinojosa and Parrish. Appellant argues that his statements to Rapp, which were made in prison years later and did not refer to the murders, did not logically advance the State's case. This argument has some merit when the statements at issue are considered in isolation, but not when the statements are considered in the context of the other evidence in the case. Expert testimony showed that Hinojosa and Parrish had both been shot three times in the head with a .22 caliber firearm. In this context, appellant's statements to Rapp with respect to putting "three in the back of [the] head" and expressing a preference for .22 caliber weapons gave a further nudge toward proving that appellant fired the fatal shots. The trial court did not abuse its discretion by admitting Rapp's testimony over appellant's relevance objection. Issue four is overruled.

Appellant contends that even if Rapp's testimony was relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice and undue delay. *See* Tex. R. Evid. 403.[4] "Probative value" refers to the inherent probative force of the proffered evidence coupled with the proponent's need for the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a tendency to suggest

---

[4] Appellant does not contend that Rapp's testimony was cumulative of other evidence, or that it risked confusing or misleading the jury. *See* Tex. R. Evid. 403.

13

decision on an improper basis, commonly but not necessarily an emotional one. *Id*. "Undue delay" refers to the likelihood that presentation of the evidence will consume an inordinate amount of time. *Id*. at 641-42.

Appellant argues that Rapp's testimony had only a slight tendency to connect him to the charged offenses, but it had a strong tendency to suggest that he was quick-tempered and prone to respond to the slightest provocation with homicidal violence. But as we have already explained, the relevance of appellant's statements to Rapp lies in the parallels between appellant's statements and the manner in which Hinojosa and Parrish were murdered. In this context, Rapp's testimony did more than merely cast appellant in a bad light, and was directly relevant to the issue of appellant's identity as the murderer. It could be argued that the State did not need Rapp's testimony given appellant's confessions of guilt to Beall and the Lamariano brothers and the presence of appellant's fingerprints in the two cabs. But these witnesses were of dubious credibility, and it was at least possible to discount the presence of appellant's fingerprints as mere coincidence. Under the circumstances, the trial court could reasonably conclude that the probative force of Rapp's testimony warranted its admission.

It was also reasonable for the court to conclude that Rapp's testimony did not present an undue risk of delay. The testimony at the guilt-innocence stage of appellant's trial fills 1347 pages of the reporter's record. Of this, only 51 pages are devoted to Rapp's testimony, including 15 pages for voir dire outside the jury's presence.

The trial court did not abuse its discretion by concluding that the probative value of Rapp's testimony was not substantially outweighed by the danger of unfair prejudice or undue delay. Issue five is overruled.

## AUTOPSY PHOTOGRAPHS

Six autopsy photographs of Hinojosa's body and eight autopsy photographs of Parrish's body were admitted in evidence. Appellant contends that the trial court abused its discretion by admitting three of these photographs. State's exhibit 214 shows the base of Hinojosa's skull from above, after the skull cap and brain had been removed. The medical examiner testified that the photograph demonstrated the three gunshot entrance wounds. State's exhibit 224 shows the left side of Parrish's head after the scalp had been reflected. The medical examiner used the photograph to show that the bullet fired into Parrish's right temple had been found beneath the scalp above his left ear. State's exhibit 227 shows the back and right side of Parrish's head after the scalp had been reflected. The medical examiner testified that this photograph showed the entrance wound caused by the gunshot to the right temple. Appellant argues that because these photographs depict the effects of the autopsy process, their probative value was outweighed by the danger of unfair prejudice. Tex. R. Evid. 403.[5]

In balancing the probative value of photographs against the danger of unfair prejudice, courts may consider such factors as their gruesomeness, detail, and size, whether they are in color, and whether the body depicted is clothed or naked. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). Autopsy photographs are generally admissible unless they depict the mutilation of the

---

[5] The State asserts that appellant failed to preserve error with respect to exhibits 224 and 227 because he did not state the grounds for his objection. The record reflects, however, that the trial court understood that appellant was making the same objection that he made to exhibit 214: the photographs were inflammatory and unfairly prejudicial.

body caused by the autopsy itself. *Id*. at 816. Changes to the body caused by the autopsy process are of minor significance if the disturbing nature of the photographs is primarily due to the injuries caused by the accused. *Id*.

The autopsy photographs appear in the record in black-and-white, but we are informed that the photographs admitted and shown to the jury were in color. All of the admitted autopsy photographs show the bullet wounds to the heads of the two victims, but the three photographs at issue also show the surgical mutilation caused by the autopsy process. It is this mutilation that makes these three photographs more disturbing than the other autopsy photographs. The State argues that the challenged photographs helped the medical examiner explain the entrance points and paths of the bullets, and were relevant in determining the position of the shooter. But while it was relevant to the State's case to show that both victims had been killed in a similar manner, the other autopsy photographs taken before the heads of the victims were surgically altered show the number and placement of the entrance wounds (and in Hinojosa's case, the one exit wound), and the powder burns indicating that the murder weapon had been held close to the heads. Nothing of significance to the State's case was added by also showing the gunshot wounds from the inside of Hinojosa's skull and after Parrish's scalp had been reflected. Under the circumstances, we conclude that the probative value of exhibits 214, 224, and 227 was outweighed by the danger of unfair prejudice, and that the trial court abused its discretion by admitting these photographs in evidence. *See Long v. State*, 823 S.W.2d 259, 275 (Tex. Crim. App. 1991) (finding error in admission of gruesome photographs that were cumulative of less gruesome photographs also in evidence).

16

Nonconstitutional errors that do not affect the defendant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A conviction must be reversed for nonconstitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). We affirm a conviction despite nonconstitutional error if, after examining the record as a whole, we are left with the fair assurance that the error did not influence the jury or had only a slight influence. *See Jones v. State*, 111 S.W.3d 600, 608-09 (Tex. App.—Dallas 2003, pet. ref'd) (holding erroneous admission of autopsy photographs to be harmless).

The medical examiner's testimony was brief and came four days before deliberations on appellant's guilt began. Each set of autopsy photographs was admitted as a group, the medical examiner briefly explained to the jury what each photograph showed, and no particular emphasis was given to the offending photographs. We are not referred to and do not find any subsequent display of or reference to the autopsy photographs. In addition to the autopsy photographs, the jury also saw photographs of the bodies as they were found at the crime scenes. It is arguable that these photographs are more disturbing than the autopsy photographs because they show more clearly the violent nature of the crimes. Considering the record as a whole, we have fair assurance that the erroneous admission of the three challenged autopsy photographs had little or no influence on the jury's guilty verdict. The admission of the photographs plainly had no adverse impact with respect to the jury's answers to the punishment issues. Issue six is overruled.

17

## SPEEDY TRIAL

Appellant contends that the trial court erred by overruling his motion to dismiss the prosecution on speedy trial grounds. The right to a speedy trial in a criminal case is guaranteed by the Sixth Amendment and article I, section 10 of the Texas Constitution. *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967); *Zamarano v. State*, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002). The right attaches when the defendant is arrested or charged. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). To decide a speedy trial claim, courts must balance four factors: length of the delay, reason for the delay, assertion of the right, and prejudice to the accused. *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972). We conduct a de novo review of the trial court's application of these factors to the pertinent facts. *Zamarano*, 84 S.W.3d at 648.

### Length of delay

Appellant was indicted for capital murder on October 12, 2004. His motion to dismiss for want of a speedy trial was filed on June 12, 2008, and overruled on June 26. Jury selection began on August 4, 2008. The State concedes that this almost four-year delay warrants a full analysis under *Barker*. This factor, in itself, weighs against the State. *Id*. at 649.

### Reason for delay

The State had the burden of justifying the delay. *Cantu*, 253 S.W.3d at 280. At the brief hearing on appellant's motion to dismiss, the State offered no evidence and merely argued against the motion. Our own review of the record reflects that a major reason for the delay of appellant's trial was the State's indecision with respect to the death penalty. On October 28, 2005, at the first pretrial hearing in the case, counsel for the State informed the court in defense counsel's

18

presence that the State was not seeking the death penalty. The State appears to have had second thoughts about this decision, because defense counsel later testified at a hearing on a different motion that she was told by the same prosecutor in March 2007 that the State was still trying to decide if it would seek the death penalty. Counsel testified that the prosecutor informed her of the State's decision not to seek the death penalty on June 6, 2007.

After the decision was made to forego seeking the death penalty, prosecutors concluded that under the law applicable to these offenses, the State was not authorized to waive the death penalty in a capital murder case. Acting on that belief, the State sought and obtained two new indictments in July 2007 that separately accused appellant of the murders of Hinojosa and Parrish. In August 2007, the State announced that it intended to consolidate the two indictments for trial, and the defense responded by invoking its mandatory right to sever. *See* Tex. Penal Code Ann. § 3.04(a) (West Supp. 2009). On September 20, 2007, the State announced in open court that rather than try the two murder indictments separately, the State would proceed to trial on the original capital murder indictment and would seek the death penalty. This announcement prompted the defense to file a motion to quash the capital murder indictment on the ground that the State was vindictively seeking to punish appellant for exercising his right to a severance. This motion was later overruled following a hearing.

On December 12, 2007, appellant's lead counsel filed a motion to withdraw on the ground that she was no longer qualified to defend a death penalty case. In the motion, counsel explained that relying on the prosecutor's previous assurance that the State would not seek the death penalty, she had withdrawn her name from the list of approved death penalty attorneys and had not

19

attended the classes required to maintain her qualification. The motion to withdraw was granted, and a new lead attorney qualified to defend death penalty cases was appointed before the next hearing in the case on February 20, 2008.

The State concedes that its difficulty in deciding whether to seek the death penalty was a factor in the delay of appellant's trial, but it urges that appellant was also culpable. The State notes that the defense filed dozens of pretrial motions, and that a total of thirteen pretrial hearings were held. The last such hearing was held on July 24, 2008, two weeks before trial began. But at least some of these defense motions were occasioned by the State's belated decision to seek the death penalty, which necessitated a change of defense strategy and required the appointment of substitute counsel. Although there is no evidence that the State deliberately attempted to delay appellant's trial, we conclude on this record that the State bears the primary responsibility for the delay. This factor also weighs against the State.

### Assertion of right

Appellant had the burden of proving that he asserted his right to a speedy trial. *Id*. Like the State, however, appellant declined the opportunity to offer evidence at the hearing on his motion to dismiss. The record reflects that appellant's original counsel filed a motion for speedy trial on July 26, 2006, but there is no evidence that this motion was ever brought to the trial court's attention for a ruling. On September 20, 2007, during a brief appearance before the court, appellant personally complained about the delay of his trial, but his counsel did not seek a ruling on the previously filed speedy trial motion or object to a further resetting. Insofar as the record reflects,

20

defense counsel first urged appellant's speedy trial claim before the court in the motion to dismiss filed and heard on June 12, 2008.

If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure. *Id*. at 283. Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant did not really want a speedy trial, but only a dismissal. *Id*. The record before us fails to show a diligent effort by appellant to obtain a speedy trial, and this factor weighs against appellant.

### *Prejudice*

Appellant also had the burden to show prejudice arising from the delay of his trial. *Id*. at 280. Prejudice is assessed in light of the three interests the speedy trial right is designed to protect: prevention of oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. *Id*. at 285. Appellant offered no evidence of prejudice at the hearing on his motion to dismiss.

Appellant does not contend that his defense was impaired by the post-indictment delay of his trial. In his brief, he argues only that he "endured almost four years of pretrial incarceration, and his anxiety and concern were undoubtedly heightened by the State's inexplicably sluggish progress in deciding whether to seek the death penalty." The record reflects, however, that appellant was in prison when he was indicted, and there is no evidence that his indictment for capital murder resulted in incarceration that he would not otherwise have experienced. Appellant's

assertion of pretrial anxiety is understandably qualified given the lack of evidence. Appellant has failed to show any substantial prejudice arising out of the pretrial delay, and this also weighs against him.

Thus, two factors weigh against the State, while two factors weigh against appellant. Although the State failed to justify the four-year delay, appellant's tardy assertion of his speedy trial right and failure to demonstrate prejudice arising from the delay convince us that the trial court did not err by overruling the motion to dismiss. Issue eight is overruled.

### DISCLOSURE OF INFORMATION

In his remaining issue, appellant does not complain of trial court error as such. Instead, appellant asks the Court to review certain documents to determine whether they contain information that should have been disclosed to the defense following an in camera examination by the trial court. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding government has duty to disclose material information to defense).

There are two sets of documents at issue, one from the Texas Department of Family and Protective Services and the other from the Austin-Travis County Mental Health and Mental Retardation Center. The former contains reports prepared by child protective services workers who investigated, and largely ruled out, reports of neglect and abuse of Beall's child. The latter contains the records from Beall's voluntary drug treatment program. Appellant issued subpoenas for both sets of records during trial. The State moved to quash the subpoenas on the ground that the records were confidential. At appellant's request, the trial court examined both sets of records in camera to

22

determine if either contained material evidence that should be disclosed to the defense. After examining the records, the court announced that they did not contain any material information.

Appellant does not dispute that the records he sought are confidential under federal and state law. *See* 42 U.S.C.A. § 290dd-2 (West 2003) (confidentiality of substance abuse treatment records); Tex. Fam. Code Ann. § 261.201 (West Supp. 2009) (confidentiality of child abuse investigations); *see also* Tex. R. Evid. 509(b) (statements made during voluntary substance abuse treatment not admissible in criminal proceeding). Appellant also agrees that the in camera inspection by the trial court was the prescribed procedure for balancing his due process right to the disclosure of material information in the government's possession and the government's interest in maintaining the confidentiality of medical and substance abuse records and child abuse investigations. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987); *Thomas v. State*, 837 S.W.2d 106, 114 (Tex. Crim. App. 1992); *Dixon v. State*, 923 S.W.2d 161, 167 (Tex. App.—Fort Worth), *vacated on other grounds*, 928 S.W.2d 564, 565 (Tex. Crim. App. 1996); *see also* 42 U.S.C.A. § 290dd-2(b)(2)(C); Tex. Fam. Code Ann. § 261.201(b); 42 C.F.R. § 2.64 (2009). Appellant asks the Court to perform its own review of the records in question to determine if the trial court abused its discretion by concluding that they did not contain material information that should have been disclosed to the defense. *See Dixon*, 923 S.W.2d at 167.

After examining the subpoenaed records in camera and announcing its ruling, the district court ordered the records sealed and retained for appellate review. The documents were not formally marked as exhibits, and they were not part of the appellate record originally filed in this Court. At the Court's request, the sealed records were located and forwarded to the Court as a supplemental record. The Court has examined both sets of records, and we have already briefly

described their contents. Neither set of records contains exculpatory evidence or evidence that would be admissible to impeach Beall. *See* Tex. R. Evid. 608(b). Neither contains any evidence that would have had a reasonable probability of affecting the outcome of appellant's trial. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (defining "materiality"). No abuse of discretion is shown. Issue seven is overruled.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   October 12, 2010

Do Not Publish